# HARRIMAN v. INTERSTATE COMMERCE COMMISSION.
# KAHN v. INTERSTATE COMMERCE COMMISSION.
# INTERSTATE COMMERCE COMMISSION v. HARRIMAN.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 315, 316, 317.  Argued November 3, 4, 1908.—Decided December 14,
1908.

The primary purpose of the Interstate Commerce Act is to regulate interstate business of carriers, and the secondary purpose, that for which the commission was established, to enforce the regulations enacted by it, and the power to require testimony is limited, as is usual in English-speaking countries, to investigations concerning a specific breach of the existing law; this power is not extended to mere investigations by provisions in any of the amendatory acts in regard to annual reports of interstate carriers, or of the commission, or for the purpose of recommending legislation.

*Quære* whether Congress has unlimited power to compel testimony in regard to subjects which do not concern direct breaches of law, and whether, and to what extent, it can delegate such power.

THE facts are stated in the opinion.

*Mr. John C. Spooner* and *Mr. John G. Milburn*, with whom *Mr. Robert S. Lovett* was on the brief, for Edward H. Harriman:

Congress has conferred upon the Interstate Commerce Commission authority to investigate, and in connection therewith compel the testimony of witnesses, only in aid of its duty to execute and enforce the provisions of the act to regulate commerce.

The commission is a body of limited powers derived exclusively from the act to regulate commerce. It is a purely administrative body charged with specific administrative duties and invested with specific powers. *Kentucky Bridge Co.* v. *L. & N. R. R. Co.*, 37 Fed. Rep. 567. The restricted operation of the act limits the powers of the commission. Neither the province of the act or the commission is coextensive with interstate commerce or interstate transportation. *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290.

An analysis of the act shows that the commission is merely an administrative agency for the enforcement of the provisions of the act to regulate commerce.[1]

The act is primarily an enumeration of particular duties imposed upon common carriers; of particular acts on their part which are prohibited; and of particular duties and powers relating thereto conferred upon the commission. The duties it imposes and the acts it prohibits are the only duties and acts of common carriers with which the act is concerned. It is an act of details and not of generalities. Every duty it imposes is definitely specified, and a carrier which observes them complies with the act in full. The primary function of the commission is to enforce the performance of those duties and prevent the doing of the prohibited acts, and to that end the necessary machinery of investigation, hearings on complaints,

---

[1] The brief contains an elaborate analysis of the act, section by section.

.and judicial proceedings is provided. With respect to other duties or acts of carriers not regulated by the act, the commission has no function to perform and it is invested with none. Congress simply has not seen fit to regulate those acts and duties or to extend to them the functions of the commission. Having defined certain duties and prohibited certain acts the commission is created as an administrative body, not with a general supervisory power over common carriers subject to the act in all their operations, transactions, and relations, but generally speaking, with. a power of supervision limited to the specific requirements of the act, and with power to enforce those requirements and determine complaints made of violations of the act after notice, answer and hearing.

The business of a common carrier covered by the act is the business of transportation;—the movement of traffic; reasonable, equal and public rates; equal facilities; and the functions of the commission are limited to those aspects of its business. The language of the act is entirely inappropriate to the creation of a power of investigation with the aid of compulsory testimony coextensive with a visitatorial power over all the acts, transactions and relations of a corporation, although a corporation engaged in part in interstate transportation.

There is nothing in § 20 or § 21 enlarging the power of the commission to investigate or warranting the contention that Congress has conferred upon the commission all the "inquisitorial powers of Congress" with respect to interstate commerce.

The cases cited in support of the claim of an inquisitorial power beyond the enforcement of the provisions of the act do not sustain it. *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447; *Interstate Commerce Commission* v. *Baird*, 194 U. S. 25; *Interstate Commerce Commission* v. *C. N. O. & T. P. Ry. Co.*, 167 U. S. 479; *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, discussed and said not to sustain the power contended for by counsel for the Interstate Commerce Commission.

*Mr. Walker D. Hines*, with whom *Mr. Paul D. Cravath* was on the brief, for appellant, Kahn:

The commission has no power to ask questions of persons not connected with carriers, except to ascertain whether or not the act has been obeyed. *Interstate Commerce Commission* v. *Reichmann*, 145 U. S. 237, 242.

The general power of the commission to inquire into the management of the business of common carriers does not authorize these questions.

The questions related to the private business of Kuhn, Loeb & Co., and not to the business of the Union Pacific.

The theory that under § 12 the commission has authority to go into the private side of transactions with a railroad company on the idea that both sides of the transaction—the railroad company's side and the opposite or private side—are both the railroad company's business, is opposed not only to the letter, but to the spirit, of the statute, and to the policy of our government. It is natural to permit an administrative board, created to supervise *quasi*-public corporations, to inquire in a purely administrative way into the affairs and papers of such corporations; but it is preposterous to permit such mere administrative inquiry to be extended into the affairs and papers of those private institutions with which the railroad company may do business.

The commission's authority to inquire into the management of the business of carriers is an authority to obtain information from carriers themselves, but not from private persons.

The commission's authority to require information from the carriers themselves does not extend to matters having no connection with the general subject-matter of the act to regulate commerce, and the questions asked Mr. Kahn have no such connection.

The commission has no power to make inquiries of private persons merely for the purpose of considering the propriety of recommending additional legislation when such questions have no relation to any inquiry as to violations of the act.

To create such a power in the commission is to give it, by unwarrantable implication, an inquisitorial power into private affairs over which it was never intended that the commission should have any supervision. The commission's investigating power is given "for the purposes" of the act. "The purposes" of the act are to be found alone in the requirements expressed in the act. Those requirements can be construed and understood and applied. To go beyond that is to go into a realm of endless speculation and uncertainty.

The commission's duty and authority are sufficiently broad and sufficiently difficult of effective and impartial discharge when confined to the things which Congress has required, and should not be extended to those things which Congress did not require, but which the commission may assume that Congress hoped to accomplish.

*Mr. Frank B. Kellogg* and *Mr. Cordenio A. Severance*, with whom *Mr. Henry L. Stimson* was on the brief, for Interstate Commerce Commission:

The Interstate Commerce Commission, in making this investigation, had all the power of a congressional committee of inquiry, so far as interstate carriers are concerned, and could inquire into the management of such interstate carriers and all the financial operations and business thereof, not only for the purpose of regulating rates, fares and charges as provided by the Interstate Commerce Act, but for the purpose of recommending additional legislation. See §§ 12, 20, 21 of the Interstate Commerce Act; *Interstate Com. Com.* v. *Brimson*, 154 U. S. 447, 474; *Interstate Com. Com.* v. *Railway Co.*, 167 U. S. 479, 506; *Texas & Pacific Ry.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 438.

The end which Congress is seeking to obtain by the Interstate Commerce Act, namely, the proper regulation of interstate commerce, being indisputably within its constitutional powers, and Congress, by the sections of the act hereinbefore quoted, having emphatically declared its opinion that an inquiry into

the financial operations of the carrier is a necessary and proper means toward achieving such an end, the courts will effectuate and not hinder the purpose of Congress.

The situation is even more serious than when a court is called upon to pass upon the constitutionality of a statute. In such a case the court will not set aside the statute unless the unconstitutionality exists beyond a reasonable doubt. *Legal Tender Cases*, 12 Wall. 531; *Trade-mark Cases*, 100 U. S. 96; *Nicol* v. *Ames*, 173 U. S. 514.

But the case now before the court goes even further. To uphold these appellants in their contumacy is to prejudge Congress and to hold that by no rational possibility could it legislate upon the subject-matter at issue; and this without permitting Congress, through the Interstate Commerce Commission, to obtain the facts upon which such legislation could properly be constitutionally based; and without permitting Congress itself after it shall have acquired such facts, within its constitutional powers of debate, to consider them. As to the power which entitles legislative committees to elicit information of the character here sought, see *In re Chapman*, 166 U. S. 668; *People* v. *Keeler*, 99 N. Y. 463; *People* v. *Sharp*, 107 N. Y. 427, and *Falvey & Kilbourn* v. *Massing*, 7 Wisconsin, 630, which lay down very clearly the rule.

This inquisitorial power of the Interstate Commerce Commission has been fruitfully used. An examination of the debates of Congress and decisions of the courts will show that it was upon information developed by the commission and reported to Congress, that the Elkins Law, the Safety Appliance Law, the Employers' Liability Act, and the Hepburn Act, were successively based; in other words, the inquisitorial work of the commission has been the basis of all congressional legislation affecting interstate carriers during the past twenty years.

The contention that the inquiry involved the private business of the appellants is no answer to the right of the commission to have the inquiry answered.

Of course, sales of property by directors to their railroad

company are not their private affairs; and any inquiry tending to show that the price of the property so sold was inadequate or fraudulent is not an inquiry into the private affairs of the directors. Nor is an inquiry into the reasons of the directors for withholding publication of a dividend, while they were engaged in private speculation in the stock on which the dividend was declared, an inquiry into the private affairs of those directors. Such transactions are no more private than the business of the railroad company is private.

But even if the transactions under inquiry had not concerned men who hold official positions in the company, but were transactions of purely private individuals, being, as they were, relevant to the subject-matter under inquiry by the commission, their privacy was no shield against the commission's probe. Wigmore on Evidence, § 2192; *Interstate Commerce Commission* v. *Baird,* 194 U. S. 46; *Burnham* v. *Morrissey,* 14 Gray, 226.

Within the sphere of inquiry entrusted to the Interstate Commerce Commission the power to investigate the truth has been deemed of such paramount importance to the public that even those privileges which usually maintain in a court of justice have been abolished by statute. No man can assert before the Interstate Commerce Commission or before a court, on an inquiry into matters within the purview of the Interstate Commerce Act, that his answer would tend to incriminate or degrade him; and his refusal to answer inquiries before that commission not only subjects him to proceedings for contempt, but is expressly made a crime (act of February 11, 1893; 27 Stat. L. 443).

MR. JUSTICE HOLMES delivered the opinion of the court.

These are appeals; on the one side, from an order of the Circuit Court directing the appellants, Harriman and Kahn, to answer certain questions put during an investigation by the Interstate Commerce Commission, and, on the other, from

a denial of a like order as to two other questions, answers to which the commission had required.

In November, 1906, the Interstate Commerce Commission, of its own motion, and not upon complaint, made an order reciting the authority and requirements of the act to regulate commerce (Feb. 4, 1887, c. 104, 24 Stat. 379), and proceeding as follows: "And whereas it appears to the Commission that consolidations and combinations of carriers subject to the act, and the relations now and heretofore existing between such carriers, including community of interests therein, and the practises and methods of such carriers affecting the movement of interstate commerce, the rates received and facilities furnished therefor should be made the subject of investigation by the Commission to the end that it may be fully informed in respect thereof, and to the further end that it may be ascertained whether such consolidations, combinations, relations, community of interests, practises, or methods result in violations of said act or tend to defeat its purposes; It is ordered that a proceeding of investigation and inquiry into and concerning the matters above stated be, and the same is hereby instituted." A time and place was set for the first hearing, and the inquiry thus begun was continued for about two months, resulting in the report of July, 1907, entitled "Consolidations and Combinations of Carriers," etc. 12 I. C. C. R. 277.

In the course of the inquiry the appellant Harriman was called by the commission and testified as a witness. At the time of the transactions referred to he was a director and also the president and the chairman of the Executive Committee of the Union Pacific Railroad Company. The relations between the Union Pacific and other connecting roads, parallel or not, were under investigation and are set forth in the commission's report. It is enough to say that the Union Pacific Railroad Company is incorporated under the laws of Utah, and, as has been asserted and assumed, has power under the state laws to purchase the stock of other railroads, a power that it has

exercised on a large scale. Among other things, it bought 103,401 shares of the preferred stock of the Chicago and Alton Railway Company. These shares had been deposited with bankers, Kuhn, Loeb & Company, by their owners, under an agreement authorizing the bankers to sell them to any purchaser at such price and upon such terms as should be approved by Messrs. Stewart, Mitchell and the witness, Harriman. He was asked whether he owned any of the stock so deposited, and how much, if any. These questions, under the advice of counsel, he declined to answer.

Next he was asked with regard to stock of the Atchison, Topeka & Santa Fé Railroad Company, bought by the Oregon Short Line Railroad Company, another Utah corporation, the stock of which was owned by the Union Pacific, whether it was part of the stock that had been acquired previously by him and two others, and whether it or any part of it was owned by any of the three. After answering the first question, "I think not," he was stopped by his counsel and refused to answer further. Again, it appearing that the Union Pacific, in July, 1906, purchased 90,000 shares of Illinois Central Railroad stock from Messrs. Rogers, Stillman and the witness, he was asked whether that stock was acquired by a pool of the three, whether it was acquired with a view of selling it to the Union Pacific, and whether it or any part of it was bought at a much lower price than $175 a share with the intent just mentioned. These questions the witness declined to answer. It appearing further that Kuhn, Loeb & Company, who were the fiscal agents of the Union Pacific, had sold to it 105,000 shares of the Illinois Central stock on the same date, he was asked if he had any interest in these shares, and whether they were acquired by a pool for the purpose of selling them to the Union Pacific. These questions the witness declined to answer. Again, it appearing that the Union Pacific had purchased stock of the St. Joseph and Grand Island Railroad Company from the witness since the last-mentioned date, he was asked when he acquired the stock and what he paid for it, and again de-

clined to answer. Finally, after it had been shown that since July, 1906, the Union Pacific had bought a large amount of New York Central Railroad stock, the witness was asked whether any of the directors of the Union Pacific were interested directly or indirectly in this stock at the time when it was sold. An answer to this question also was declined. All these refusals to answer were persisted in after a direction to answer from the commission. The Circuit Court ordered them to be answered and Harriman appealed.

The petition of the Interstate Commerce Commission set forth two other questions which the witness refused to answer, and on which it asked the order of the Circuit Court. One was a general one, whether he was interested in any stocks bought between the nineteenth of July and the seventeenth of August that appreciated, and another, more specific, was whether he or any director bought any Union and [or] Southern Pacific in anticipation of a certain dividend, the suggestion being that announcement of the dividend was delayed for the directors to profit by their secret knowledge and that they did so. With regard to these the petition was denied, and the Interstate Commerce Commission appealed.

The appellant Kahn was a member of the firm of Kuhn, Loeb & Company. He also was asked whether any of the directors of the Union Pacific were the real owners of any of the shares of the Chicago and Alton Railroad deposited, as has been stated, with Kuhn, Loeb & Company, and sold to the Union Pacific. He was asked further in various forms whether the before mentioned 105,000 shares of Illinois Central stock, or any part of them, really belonged to or were held for any of the directors of the Union Pacific. And again, whether at the same time that he bought these shares he bought for Messrs. Harriman, Rogers and Stillman the stocks they sold at the same time that he sold his. Finally he was asked whether the 105,000 shares, and the 90,000 shares turned in by Stillman, Rogers and Harriman, were all bought through his instrumentality for a pool of which they and he were members, that

was operating in Illinois Central stocks for some months before July, 1906. All these questions he was directed by the commission to answer, but refused. The Circuit Court ordered him to answer, and he appealed.

Many broad questions were discussed in the argument before us, but we shall confine ourselves to comparatively narrow ground. The contention of the commission is that it may make any investigation that it deems proper, not merely to discover any facts tending to defeat the purposes of the act of February 4, 1887, but to aid it in recommending any additional legislation relating to the regulation of commerce that it may conceive to be within the power of Congress to enact; and that in such an investigation it has power, with the aid of the courts, to require any witness to answer any question that may have a bearing upon any part of what it has in mind. The contention necessarily takes this extreme form, because this was a general inquiry started by the commission of its own motion, not an investigation upon complaint, or of some specific matter that might be made the object of a complaint. To answer this claim it will be sufficient to construe the act creating the commission, upon which its powers depend.

Before taking up the words of the statute the enormous scope of the power asserted for the commission should be emphasized and dwelt upon. The legislation that the commission may recommend embraces, according to the arguments before us, anything and everything that may be conceived to be within the power of Congress to regulate, if it relates to commerce with foreign nations or among the several States. And the result of the arguments is that whatever might influence the mind of the commission in its recommendations is a subject upon which it may summon witnesses before it and require them to disclose any facts, no matter how private, no matter what their tendency to disgrace the person whose attendance has been compelled. If we qualify the statement and say only, legitimately influence the mind of the commission in the opinion of the court called in aid, still it will be seen

that the power, if it exists, is unparalleled in its vague extent.
Its territorial sweep also should be noticed. By § 12 of the
act of 1887, the commission has authority to require the at-
tendance of witnesses "from any place in the United States,
at any designated place of hearing." No such unlimited com-
mand over the liberty of all citizens ever was given, so far as
we know, in constitutional times, to any commission or court.

How far Congress could legislate on the subject-matter of
the questions put to the witnesses was one of the subjects
of discussion, but we pass it by. Whether Congress itself has
the unlimited power claimed by the commission, we also leave
on one side. It was intimated that there was a limit in *Inter-
state Commerce Commission* v. *Brimson*, 154 U. S. 447, 478,
479. Whether it could delegate the power, if it possesses it,
we also leave untouched, beyond remarking that so unqualified
a delegation would present the constitutional difficulty in most
acute form. It is enough for us to say that we find no attempt
to make such a delegation anywhere in the act.

Whatever may be the power of Congress, it did not attempt,
in the act of February 4, 1887, c. 104, 24 Stat. 379, to do more
than to regulate the interstate business of common carriers,
and the primary purpose for which the commission was estab-
lished was to enforce the regulations which Congress had im-
posed. The earlier sections of the statute require that charges
shall be reasonable, prohibit discrimination and pooling of
freights, require the publication of rates, and so forth, in well-
known provisions. Then, by § 11, the Interstate Commerce
Commission is created, and by § 12, as amended by later acts,
the commission has "authority to inquire into the manage-
ment of the business of all common carriers subject to the
provisions of this act, and shall keep itself informed as to the
manner and method in which the same is conducted, and shall
have the right to obtain from such common carriers full and
complete information necessary to enable the commission to
perform the duties and carry out the objects for which it was
created; and the commission is hereby authorized and required

to execute and enforce the provisions of this act." District attorneys to whom the commission may apply are to institute and prosecute all necessary proceedings for the enforcement of the act and for the punishment of violations of it; and "for the purposes of this act the commission shall have power to require, by subpœna, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation." Then comes the provision to which we already have called attention, by which a witness could be summoned from Maine to Texas, and then follow clauses for enforcing obedience to the subpœna by an order of court and for taking depositions, which do not need statement.

The commission it will be seen is given power to require the testimony of witnesses "for the purposes of this Act." The argument for the commission is that the purposes of the act embrace all the duties that the act imposes and the powers that it gives the commission; that one of the purposes is that the commission shall keep itself informed as to the manner and method in which the business of the carriers is conducted, as required by § 12; that another is that it shall recommend additional legislation under § 21, to which we shall refer again, and that for either of these general objects it may call on the courts to require any one whom it may point out to attend and testify if he would avoid the penalties for contempt.

We are of opinion on the contrary that the purposes of the act for which the commission may exact evidence embrace only complaints for violation of the act, and investigations by the commission upon matters that might have been made the object of complaint. As we already have implied the main purpose of the act was to regulate the interstate business of carriers, and the secondary purpose, that for which the commission was established, was to enforce the regulations enacted. These in our opinion are the purposes referred to; in other words the power to require testimony is limited, as it usually is in English-speaking countries at least, to the only cases where the sacrifice

of privacy is necessary—those where the investigations con-
cern a specific breach of the law.

That this is the true view appears, we think, sufficiently from
the original form of § 14. That section made it the duty of the
commission, "whenever an investigation shall be made," to
make a report in writing, which was to "include the findings
of fact upon which the conclusions of the Commission are based,
together with its recommendation as to what reparation, if
any, should be made by the common carrier to any party or
parties who may be found to have been injured; and the find-
ings so made shall thereafter, in all judicial proceedings, be ·
deemed *prima facie* evidence as to each and every fact found."
As this applied, in terms, to all investigations, it is plain that
at that time there was no thought of allowing witnesses to be
summoned except in connection with a complaint for contra-
ventions of the act, such as the commission was directed to.
"investigate" by § 13, or in connection with an inquiry in-
stituted by the commission, authorized by the same section,
"in the same manner and to the same effect as though com-
plaint had been made." Obviously such an inquiry is limited
to matters that might have been the object of a complaint.

The plain limit to the authority to institute an inquiry given
by § 13, and the duty to make a report with findings of facts,
etc., in the section next following, with hardly a word between,
hang together, and show the purposes for which it was intended
that witnesses should be summoned. They quite exclude the
inference of broader power from the general words in § 12, as
to inquiring into the management of the business of common
carriers, subject to the provisions of the act, the commission
keeping itself informed, etc. They equally exclude such an
inference from § 21, the other section on which most reliance
is placed. That, as it now stands, requires an annual report,
containing "such information and data collected by the Com-
mission as may be considered of value in the determination of
questions connected with the regulation of commerce, to-
gether with such recommendations as to additional legislation

relating thereto as the Commission may deem necessary." Act of March 2, 1889, c. 382, § 8, 25 Stat. 855, 862.

It is true that in the latest amendment of § 14, findings of fact are required only in case damages are awarded. Act of June 29, 1906, c. 3591, § 3, 34 Stat. 584, 589. But there is no change sufficient to affect the meaning of the words in § 12, as already fixed. If by virtue of § 21 the power exists to summon witnesses for the purpose of recommending legislation, we hardly see why, under the same section, it should not extend to summoning them for the still vaguer reason that their testimony might furnish data considered by the commission of value in the determination of questions connected with the regulation of commerce. If we did not think, as we do, that the act clearly showed that the power to compel the attendance of witnesses was to be exercised only in connection with the *quasi*-judicial duties of the commission, we still should be unable to suppose that such an unprecedented grant was to be drawn from the counsels of perfection that have been quoted from §§ 12 and 21. We could not believe on the strength of other than explicit and unmistakable words that such autocratic power was given for any less specific object of inquiry than a breach of existing law, in which, and in which alone, as we have said, there is any need that personal matters should be revealed.

In §§ 15 and 16 are further provisions for the enforcement of the act, not otherwise material than as showing the main purpose that Congress had in mind. The only other section that is thought to sustain the argument for the commission is § 20, amended by act of June 29, 1906, c. 3591, § 7, 34 Stat. 584, 593. This authorizes the commission to require annual reports from all the carriers concerned, with details of what is to be shown, to which the commission may add in certain particulars, and further "to require from such carriers specific answers to all questions upon which the Commission may need information." The commission may require certain other reports, and is to have access to all accounts, records and memoranda. The section now deals at length with this matter and how ac-

counts shall be kept and the like.    It seems to us plain that
it is directed solely to accounts and returns, and is imposing a
duty on the common carrier only from whom the returns come.
All that we are considering is the power under the act to
regulate commerce and its amendments to extort evidence
from a witness by compulsion.    What reports or investigations
the commission may make without that aid but with the help
of such returns or special reports as it may require from the
carrier, we need not decide. Upon the point before us we should
infer from the later action of Congress with regard to its reso-
lution of March 7, 1906, 34 Stat. 823, directing the commission
to investigate and report as to railroad discrimination and
monopolies in coal and oil, that it took the same view that we
do.    For it thought it advisable to amend that resolution on
March 21 by adding a section giving the commission the same
power it then had to compel the attendance of witnesses in
the investigation ordered.    34 Stat. 824.    The mention of the
power then possessed obviously is intended simply to define
the nature and extent of the power by reference to § 12 of the
original act.    The passage of the amendment indicates that
without it the power would be wanting.    The case is not af-
fected by the provision of § 9 of the act of June 29, 1906, c.
3591, § 9, 34 Stat. 595, extending the former acts relating to
the attendance of witnesses and the compelling of testimony to
"all proceedings and hearings under this Act."    If we felt
more hesitation than we do, we still should feel bound to con-
strue the statute not merely so as to sustain its constitutionality
but so as to avoid a succession of constitutional doubts, so
far as candor permits.    *Knights Templar & Indemnity Co.* v.
*Jarman*, 187 U. S. 197, 205.

> *Order in* 315 *and* 316 *reversed.*
> *Order in* 317 *affirmed.*
> *Petition denied.*

MR. JUSTICE MOODY, not having been present at the argu-
ment, took no part in the decision.

MR. JUSTICE DAY, dissenting.

I am constrained to dissent from the opinion of the court in this case. It seems to me that too narrow a construction has been given to the. act of Congress conferring power upon the Interstate Commerce Commission to conduct investigations into the affairs of corporations engaged in interstate commerce.

The court in the prevailing opinion has not placed its decision upon the want of power in Congress to legislate concerning the subject-matter of investigation in this case. The decision is based wholly upon the construction of the act of Congress, and as I am unable to concur in the view taken in the opinion, I will state the grounds upon which my dissent rests.

The reports of committees which accompanied the enactment of the Interstate Commerce Law, in its original form, show that importance was attached to the power conferred upon the commission to make investigations as well as to make orders relating to specific complaints as to practices affecting the conduct of interstate commerce and the instrumentalities by which the same is carried on. It was to have a power of investigation, such as had been conferred upon similar bodies in the States and in the English acts regulating the subject, with a view to eliciting information important to be had, in order to lay the basis for intelligent and efficient action in the legislative branch of the Government to which the Constitution has delegated power to regulate commerce among the States and with foreign nations.

In speaking of this power, Judge Cooley, the eminent chairman of the commission, in its first annual report, said:

"This is a very important provision and the commission will no doubt have frequent occasion to take action under it. It will not hesitate to do so in any case in which a mischief of public importance is thought to exist, and which is not likely to be brought to its attention on complaint of a private prosecutor."

In numerous instances investigations have been conducted by the commission having in view the exercise of its authority to afford information as to the manner and methods in which corporations engaged in interstate commerce are conducting their business. These investigations have been undertaken upon the initiative of the commission; witnesses have been subpœnaed; and testimony has been taken without objection from those interested that the power of the commission conferred by the acts of Congress had been exceeded. While these considerations are not determinative of the extent of the powers conferred in the act, they are suggestive of the practical construction which those interested have put upon it.

The act itself makes provision for two kinds of investigation, the one under § 12 upon the initiative of the commission without written complaint; the other under § 13, where investigation and orders are made upon complaint.

We are concerned in this case with an investigation undertaken upon the initiative of the commission under § 12 of the act. That section, so far as pertinent, provides:

"That the commission hereby created shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this act, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information necessary to enable the commission to perform the duties and carry out the objects for which it was created; and the commission is hereby authorized and required to execute and enforce the provisions of this act; and, upon the request of the commission, it shall be the duty of any district attorney of the United States to whom the commission may apply to institute in the proper court and to prosecute under the direction of the Attorney General of the United States all necessary proceedings for the enforcement of the provisions of this act and for the punishment of all violations thereof, and the costs and expenses of such prosecution shall be paid out of the appropriation for the expenses

of the courts of the United States; and for the purposes of this act the commission shall have power to require, by subpœna, the attendance and testimony of witnesses and the production of all books, papers, tariffs, contracts, agreements, and documents relating to any matter under investigation.

"Such attendance of witnesses, and the production of such documentary evidence, may be required from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpœna the commission, or any party to a proceeding before the commission, may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of books, papers, and documents under the provisions of this section."

The plain reading of this section is that for the purposes of the act the commission shall have power to require, by subpœna, the attendance and testimony of witnesses, and the production of books, papers, contracts, tariffs, agreements, and documents relating to any matter under investigation. Notwithstanding the broad language used by Congress, it is now held that the power of the commission to require testimony embraces only subjects stated in complaints for the violation of the act, or investigations by the commission upon matters which might have been the subject of complaint. I am unable to follow the reasoning which thus cuts down the expressed words of the act, which enables the commission to require testimony for all purposes of the act. The complaints under the act may relate to unreasonable rates, to discriminating practices, to the management of the affairs of the carrier as involved in or connected with the conduct of interstate commerce, to the relations of interstate carriers with each other, and the like matters, directly affecting corporations and individuals engaged in interstate commerce. These things are within the purposes of the act, but no more so, in my judgment, than the declared purpose of the act to endow the commission with investigating powers, having in view the ascertainment of the manner in which interstate commerce business is con-

ducted and managed, with a view to intelligent action upon
these important subjects.

For the purposes of the act this power to require the attend-
ance of witnesses and the production of books, papers, tariffs,
contracts, etc., relating to any matter under investigation, is
specifically conferred by Congress. To make the act read that
the power shall be conferred only for the purposes of laying
the ground for redress of specific complaints, or things which
might be the subject-matter of complaints, narrows its pro-
visions from the broad power conferred in the language used
by Congress to powers limited to the execution of only a part
of the act. It seems to me that the restricted construction
given in the opinion has the effect to entirely reform the act
of Congress, substituting for it, by judicial construction, a
much narrower act than Congress intended to pass, and did
in fact, pass.

In § 12, which requires the district attorneys under the di-
rection of the Attorney General to take all necessary proceed-
ings for the enforcement of the act, and empowers the com-
mission for the purposes of the act to issue subpœnas and
require the production of books, papers, etc., there is in terms
conferred, as the basis of this judicial action and this power to
summon witnesses, authority to inquire into the management
of the business of corporations subject to the provisions of the
act, in order that the commission may keep itself informed
as to the manner and methods in which the same is conducted,
and to obtain from common carriers thus engaged full and
complete information to enable the commission to prevent
bad practices and to perform the duties and carry out the ob-
jects for which it was created.

Nor are the purposes of the act for which the power to sub-
pœna witnesses, require the production of books, papers, etc.,
alone defined in § 12. In § 20 of the act, in order to enable the
commission to make its reports, it is authorized to require
from common carriers specific answers upon all questions upon
which the commission may need information, such reports to

contain a showing of the amount of the capital stock, the amount paid therefor, the manner of payment for the same, etc., and § 21 of the act requires the commission to make an annual report which shall contain such information and data collected by the commission as may be considered of value in the determination of questions concerning the regulation of commerce, together with such recommendation as to additional legislation relating thereto as the commission may deem necessary. These things are "purposes of the act" no less than the hearing of complaints and making orders touching the same. For all these purposes § 12 conferred the power which was sought to be exercised in this case. That inquiries might take a wide range is shown in the acts of Congress giving immunity to persons required to testify, and providing that no person shall be excused from attendance and testifying, or from producing books, papers, etc., before the Interstate Commerce Commission for the reason that his answers or the production of such testimony may tend to criminate him, and granting immunity from prosecution because of such compulsory testimony.

The function of investigation which Congress has conferred upon the Interstate Commerce Commission is one of great importance, and while of course it can only be exercised within the constitutional limitations which protect the individual from unreasonable searches and seizures and unconstitutional invasions of liberty, the act should not be construed so narrowly as to defeat its purposes.

In the case of *Interstate Commerce Commission v. Brimson*, 154 U. S. 447, 474, this court had under consideration the provisions of § 12, authorizing the Interstate Commerce Commission to conduct an investigation upon its own motion, and in that case this court said:

"An adjudication that Congress could not establish an administrative body with authority to investigate the subject of interstate commerce, and with power to call witnesses before it, and to require the production of books, documents and

papers relating to that subject, would go far towards defeating the object for which the people of the United States placed commerce among the States under national control. All must recognize the fact that the full information necessary as a basis of intelligent legislation by Congress from time to time upon the subject of interstate commerce cannot be obtained, nor can the rules established for the regulation of such commerce be efficiently enforced otherwise than through the instrumentality of an administrative body representing the whole country, always watchful of the general interests, and charged with the duty not only of obtaining the required information, but of compelling by all lawful methods obedience to such rules."

And in *Interstate Commerce Commission* v. *Railway*, 167 U. S. 506, this court said:

"It [the commission] is charged with the general duty of inquiring as to the management of the business of railroad companies, and to keep itself informed as to the manner in which the same is conducted, and has the right to compel complete and full information as to the manner in which such carriers are transacting their business."

In the case of *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 438, this court said:

"The commission was endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts, and their methods of dealing, and generally to enforce the provisions of the act."

In the case last cited it was held that a rate filed with the Interstate Commerce Commission could only be attacked for unreasonableness by a proceeding before the commission, with a direct view to a change in the rate. The power thus invested in the commission, no less than the power conferred in this case, affected shippers from Maine to Texas, and required a shipper making complaint against a common carrier for carriage in a remote part of the country to obtain redress for unreasonable rates only by a proceeding before the Interstate Commerce Commission, which ordinarily sits in the capital at

Washington. Legislative power vested in Congress over interstate commerce embraces the whole country, and while it may be extremely inconvenient to compel the attendance of witnesses and the production of the, papers, etc., throughout a domain so large as ours, that consideration does not detract from the power of Congress over the subject-matter.

Assuming, for the purposes of this case and the construction of the statute, that the relations of directors in a corporation engaged in interstate commerce to the sales of stock to such corporation may be the subject of inquiry when Congress confers such power upon the commission, I think that in this act Congress has conferred such power. If such is the proper construction of the act, it follows that the commission had a right to propound the questions which the Circuit Court directed to be answered. In my view the judgment of the Circuit Court should be affirmed.

MR. JUSTICE HARLAN and MR. JUSTICE MCKENNA concur in this dissent.

MR. JUSTICE HARLAN also dissents in No. 317.