**STAHLMAN v. FEDERAL COMMUNI-
CATIONS COMMISSION.**

No. 8039.

United States Court of Appeals for the
District of Columbia.

Argued Dec. 3, 1941.

Decided Jan. 26, 1942.

Mr. Elisha Hanson, of Washington, D. C., with whom Mr. Harold L. Cross, Jr., and Miss Letitia Armistead, both of Wash- ington, D. C., were on the brief, for appellant.

Mr. Thomas E. Harris, Asst. Gen. Counsel, Federal Communications Commission, with whom Mr. Telford Taylor, Gen. Counsel, Federal Communications Commission, both of Washington, D. C., appeared on the brief, for appellee.

Before GRONER, Chief Justice, and VINSON and EDGERTON, Associate Justices.

GRONER, C. J.

On March 20, 1941, the Federal Communications Commission issued its order No. 79, which directed that it " * * * undertake an immediate investigation to determine what statement of policy or rules, if any, should be issued concerning applications for high frequency broadcast stations (FM) with which are associated persons also associated with the publication of one or more newspapers * * * and that such investigation * * * shall also include consideration of statements of policy or rules, if any, which should be issued concerning future acquisition of standard broadcast stations by newspapers."

In July following, the Commission issued a supplemental order No. 79-A,[1] in which it

---

[1] Now, Therefore, It is Ordered, That, pursuant to the aforesaid order, testimony and other evidence be taken with reference to the following matters, in addition to such other matters as the Commission may from time to time direct:

1. To what extent broadcast stations are at present associated with persons also associated with publication of one or more newspapers, the classification (in terms of power, location, network affiliation, etc.) of broadcast stations so associated, the circumstances surrounding such association, and the tendency toward such association in the future.

2. Whether joint association of newspapers and broadcast stations tends or may tend to prejudice the free and fair presentation of public issues and information over the air, or to cause editorial bias or distortion, or to inject editorial policy or attitude into the public service rendered by broadcast stations as a medium of public communication.

3. Whether joint association of newspapers and broadcast stations tends or may tend to restrict or distort the broadcasting of news, or to limit the sources of news to the public, or to affect adversely the relation between newsgathering services and broadcast stations.

4. Whether the joint association of newspapers and broadcast stations has or may have any effect upon freedom of access to the radio forum, for the discussion of public issues.

5. Whether the joint association of newspapers and broadcast stations tends or may tend to lessen or increase competition among broadcast stations or to result in the monopolization of local broadcast facilities.

6. Whether the joint association of newspapers and broadcast stations tends or may tend to increase or decrease concentration of control over broadcast facilities or the use thereof.

7. Whether the joint association of newspapers and broadcast stations constitutes or may constitute an undue concentration of control over the principal media for public communication.

8. Whether joint association of newspapers and broadcast stations tends or may tend to result in the utilization of improved facilities and skilled, experienced personnel for the procuring and dissemination of information and opinion by broadcast stations.

9. Whether joint association of newspapers and broadcast stations tends or may tend to insure greater economic sta-

particularized the subjects to be considered at the hearing. About the same time the Commission forwarded to broadcast station licensees a questionnaire intended to elicit information concerning the relations between licensees and newspapers in their respective communities, and in the latter part of July issued and served on appellant a subpoena requiring his presence in Washington on August 1, "then and there to testify in the above-entitled cause now pending before this Commission". Appellant is the publisher of the Nashville Banner, and in times past has been president of the American Newspaper Publishers Association, president of the Southern Newspaper Publishers Association, vice-chairman of the Publishers National Radio Committee, and a member of the Radio Committee of the American Newspaper Publishers Association. The Commission advised appellant by letter of July 10 that at the hearings to begin July 23 the Commission planned to receive testimony concerning the past and present relations between the radio industry and radio networks on the one hand, and the newspaper industry and press services on the other, with respect to the joint association of newspapers and radio stations. And it was stated further that the Commission would inquire into the arrangements made in the past for broadcasting of news, the part played by radio stations associated with newspapers in that respect, the availability of newspaper reports for broadcasts, the collection of news for radio broadcasting, and other related matters coming within the scope of the topics set forth in the order. Appellant referred the papers served on him, including the letter, to his counsel, who advised him that the subpoena was a nullity, inasmuch as it purported to command him to appear and testify in a proceeding not authorized by the Act. Subsequently in the hearing, the American Newspaper Publishers Association appeared specially and on the grounds just mentioned moved the Commission to terminate the proceeding. The motion was denied. Appellant did not appear as commanded, and on August 2 the Commission filed in the District Court an application to require his appearance. An order to show cause issued, to which appellant filed his return and answer. A hearing was had, and the District Judge entered an order requiring appellant to appear before the Commission to testify concerning the matters to be investigated under Commission order No. 79.

On this appeal, appellant insists very earnestly that the sole question is whether the Commission has the power to consider or to adopt and apply a general policy or rule by which persons engaged in the newspaper publishing business or associated therewith may by reason of that fact alone be differentiated as a class apart from all other persons for the purpose either of preference in the assignment of radio facilities or of disqualification from engaging in the radio broadcasting business. The Commission, on the other hand, contends that its inquiry under order 79 is proper in connection with its licensing functions under Section 309(a) of the Act;[2] and would also be proper under Section 4(k), 47 U.S.C.A. § 154(k), which directs the Commission to make annual reports to Congress as to additional legislation deemed by it to be necessary. But in its order Section 4(k) is not mentioned. Nor is the language or form of the order responsive to that section. We have, therefore, considered the question solely under the Commission's general powers and duties and to the exclusion of that section.

Both sides apparently are in agreement that the validity of the subpoena may be tested in the manner in which the question is presented here.

■ The rule most frequently invoked in challenging the powers of an administrative body to constitute itself an inquisitorial or visitorial body as to all matters direct and collateral within its general jurisdiction was stated by Mr. Justice Holmes in Harriman v. Interstate Commerce Commission, 211 U. S. 407, 29 S.Ct. 115, 53 L.Ed. 253. In that case the Interstate Commerce Commission had of its own motion undertaken an investigation in relation to carrier community of interests as tending to violate or to defeat the purposes of the Act. Mr. Harriman, an official of the Union Pacific, was called as a

---

bility for broadcast stations and to encourage the maximum technological development of radio.

10. What considerations influence newspaper interests to acquire broadcast stations.

[2] Sec. 309(a), 47 U.S.C.A. § 309(a):
"If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. * * * "

witness, and the case went to the Supreme Court as the result of his refusal to answer a question in relation to certain investments in the securities of competing carriers. The Supreme Court sustained his position, holding in effect that, as the Act was drawn, an investigation by the Interstate Commerce Commission of its own motion must be ancillary to a lawful purpose embraced within the powers granted in the statute. Subsequently, Section 13 of the Interstate Commerce Act was amended, 49 U.S.C.A. § 13, to authorize investigations by the Commission on its own motion concerning any question which might arise under any of the provisions of the Act or relating to the enforcement of any provision of the Act, and in Smith v. Interstate Commerce Commission, 245 U.S. 33, 38 S.Ct. 30, 62 L.Ed. 135, the Court sustained the power of the Commission to investigate the expenditure by railroads of money for political purposes. In the Communications Act,[3] as in the amendment to the Interstate Commerce Act, full authority and power is given to the Commission with or without complaint to institute an inquiry concerning questions arising under the provisions of the Act or relating to its enforcement. This, we think, includes authority to obtain the information necessary to discharge its proper functions, which would embrace an investigation aimed at the prevention or disclosure of practices contrary to public interest. Cf. Federal Trade Commission v. National Biscuit Co., D.C., 18 F.Supp. 667; Fleming v. Montgomery Ward & Co., 7 Cir., 114 F.2d 384, certiorari denied, 311 U.S. 690, 61 S.Ct. 71, 85 L.Ed. 446.

■■ If in this case it had been made to appear, as counsel for appellant insist, that the Commission's investigation was solely for the purpose of the consideration or adoption of a hard and fast rule or policy, as the result of which newspaper owners may be placed in a proscribed class and thus made ineligible to apply for or receive broadcast licenses, we should be obliged to declare that such an investigation would be wholly outside of and beyond any of the powers with which Congress has clothed the Commission. For we have previously held that there is nothing in the Act which either prevents or prejudices the right of a newspaper, as such, to apply for and receive a license to operate a radio broadcast station. Tri-State Broadcasting Co. v. Federal Communications Comm., 68 App.D.C. 292, 96 F.2d 564. Further consideration confirms that view.

■ The Communications Act requires no more of an applicant for a radio license than proof of citizenship, character, and financial and technical qualifications to operate in the public interest. Possessing these, the applicant's eligibility is unchallengeable, assuming there is an unused frequency free of interference with an established station. This is the rule announced by the Supreme Court in the Sanders case.[4] But the determination of these qualifications is an administrative function which Congress has committed to the Commission, subject only to the requirement that in granting or refusing the license it shall act as the public convenience, interest, or necessity requires. This, however, as the Supreme Court remarked, is not a grant of unlimited power, but only the right to control the range of investigation in ascertaining what, within the compass of the Act, is proper to satisfy the requirements.[5] It does not embrace and should not be extended by implication to embrace a ban on newspapers as such, for in that case it would follow that the power to exclude exists also as to schools and churches; and if to these, the interdict might be applied wherever the Commission chose to apply it. This, we think, would be in total contravention of that equality of right and opportunity which Congress has meticulously written into the Act, and likewise in contravention of that vital principle that whatever fetters a free press fetters ourselves. In this view, we need not consider whether the power exists even in Congress, for Congress has not undertaken, and probably never will undertake, to delegate such power to the Commission. Hence it is that in the present state of the law a newspaper owner who is also the owner of

---

[3] Sec. 403, 47 U.S.C.A. § 403:
"The Commission shall have full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing concerning which complaint is authorized to be made, to or before the Commission by any provision of this Act [chapter], or concerning which any question may arise under any of the provisions of this Act [chapter], or relating to the enforcement of any of the provisions of this Act [chapter]."

[4] Federal Communications Comm. v. Sanders Bros. Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037.

[5] Fed. Radio Comm. v. Nelson Bros. Co., 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406.

a broadcast station may very well say to whoever challenges this dual right: "Who art thou that judgest another man's servant. To his own master he standeth or falleth".

But in the view we take of this controversy, the Commission's independent right to carry on its proposed investigation is not foreclosed by anything we have said as to its lack of power to proscribe newspapers or, conversely, its power to place them in a preferred class. Nor is this right prejudiced by the fact—if it is a fact—that the Commission in inaugurating the investigation has misapprehended the limits of its powers. The Commission's right to grant licenses or to revoke licenses in the public interest, and likewise to make rules and regulations necessary to the carrying out of the provisions of the Act, implies the grant of all means necessary or appropriate to the discharge of the powers expressly granted.

In the case we have, the Commission in its supplementary order has specified the subjects about which it wishes to obtain information. These are: whether the joint association of newspapers and broadcast stations tends to prejudice the free and fair presentation of public issues and information over the air; whether such association tends to restrict or distort the broadcasting of news or to limit the sources of news to the public; whether such association affects freedom of access to the radio forum for the discussion of public issues, or unduly limits access of newsgathering services, to the injury of the public. From the other side of the picture, the Commission proposes to inquire whether association of newspapers and broadcast stations will result in utilization of improved facilities and experienced personnel in the procuring and dissemination of information, and whether such association may tend to insure greater economic stability and encourage maximum technological development, and finally, what considerations influence newspaper interests to acquire broadcast stations. These subjects, except perhaps the last named, are clearly within the inherent powers of the Commission. Based on these considerations, and

although the information is not for use in any pending proceeding or pending legislation, it was nevertheless within the administrative powers of the Commission to initiate the proposed investigation for the purpose of ascertaining the facts for its guidance in making reasonable and proper public rules, for application to existing stations, and in the consideration of future requests.

In saying this we do not mean to hold or to suggest that the Commission is authorized to require appellant or other witnesses whom it may summon to bare their records, relevant or irrelevant, in the hope that something will turn up, or to invade the privacy protected by the Fourth Amendment, cf. Federal Trade Comm. v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786, but only that the Commission may, without interference, seek through an investigation of its own making information properly applicable to the legislative standards set up in the Act. We should not assume that the investigation will be conducted for any other purpose or in disregard of the constitutional limits which govern such procedure. Fed. Radio Comm. v. Nelson Bros. Co., 289 U.S. 266, 276, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406. Cf. Guthrie v. Harkness, 199 U.S. 148, 26 S.Ct. 4, 50 L.Ed. 130, 4 Ann.Cas. 433.

The order of the court below is accordingly affirmed.

Affirmed.

EDGERTON, Associate Justice.

Since the Commission does not appear to have forbidden common control of newspapers and broadcast stations, or to have found that such control is contrary to the public interest, or to have initiated an investigation with a view to such a finding, we need not determine whether it should or could do those things. I express no opinion on that question. I think we should wait until it arises and the interested parties, including the Commission, are heard upon it. In other respects, I concur in the opinion of the court.