**FEDERAL COMMUNICATIONS COMMISSION, Applicant,**

v.

**Ralph M. COHN, Vice President and General Manager, Screen Gems, Inc.; Screen Gems, Inc.; Charles Miller, Secretary, Revue Productions, Inc.; Revue Productions, Inc.; John L. Sinn, President, Ziv Television Programs, Inc.; Ziv Television Programs, Inc.; W. A. Handley, Assistant Secretary, MCA-TV, Ltd.; and MCA-TV, Ltd., Respondents.**

United States District Court
S. D. New York.

Sept. 5, 1957.

† Now 8 U.S.C.A. § 1401.

Warren E. Baker, Gen. Counsel, Richard A. Solomon, Asst. Gen. Counsel, Joel Rosenbloom, Washington, D. C., for applicant, Federal Communications Comm., Harold J. Raby, Asst. U. S. Atty., New York City, of counsel.

Paul A. Porter, Washington, D. C., and Daniel Glass, New York City, for respondents Ralph M. Cohn and Screen Gems, Inc., Arnold, Fortas & Porter, Washington, D. C., of counsel.

Simpson, Thacher & Bartlett, New York City, for respondents, Revue Productions, Inc., Charles Miller, MCA–TV, Ltd. and Walter Handley, Cyrus R. Vance, Edwin L. Weisl, Jr., New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for respondents, John L. Sinn and Ziv Television Programs, Inc., Samuel J. Silverman, Adrian W. DeWind, Stephen Wise Tulin, New York City, of counsel.

**FREDERICK VAN PELT BRYAN,** District Judge.

This is a proceeding brought by the Federal Communications Commission to enforce administrative subpoenas duces tecum, pursuant to 47 U.S.C.A. §§ 409(f) and (g), and an order of the Commission directing the production of the material called for by the subpoenas, pursuant to 47 U.S.C.A. § 401(b). The subpoenas were issued in connection with the work of the "Network Study Committee" of the Commission which is engaged in a comprehensive study of radio and television network broadcasting. They are addressed to various corporations engaged in the independent production and sale of television programs and officers of these companies, who are the respondents here.

The proceeding was heard before me on the petition of the Commission and the answers of the various respondents supplemented by extensive affidavits.

Respondents contend that the court should not enforce these subpoenas on the grounds that

(a) Respondents are not subject to the regulatory power of the Commission and the material sought is irrelevant and immaterial to any proceeding or investigation which the Commission is authorized by law to bring or make.

(b) The material sought is irrelevant to and outside the scope of the network study in connection with which the subpoenas were issued.

(c) The subpoenas are technically defective because they were not properly issued by the Commission as the statute requires.

Respondents also assert that, in any event, the subpoenas are unreasonable and oppressive and that the court, in its discretion, should limit the material which respondents are required to produce. Thus this proceeding involves both the validity and the scope of these subpoenas.

The subpoenas which the Federal Communications Commission seeks to enforce in this proceeding were signed and issued on April 23, 1957 by Chairman McConnaughey of the Commission, as Chairman of the Commission's Network Study Committee. They directed the respondents to appear at an investigatory hearing before a designated presiding officer (the Chief Hearing Examiner of the Commission) on May 1, 1957 and to produce the described books, papers, documents and data.

The order sought to be enforced was adopted by the Federal Communications Commission *en banc* on June 5, 1957,[1] and, *inter alia,* confirmed the subpoenas previously issued as continuing and remaining in force, and again directed the

---

1. F.C.C. 57–566, Docket No. 11960.

several respondents to appear before the presiding officer and to produce the material which the subpoenas called for.

The facts as they appear from the papers before me are as follows:

The investigation in which the subpoenas were issued originated in 1955 when Congress made an appropriation of $80,000 for fiscal year 1956 for a comprehensive "study of radio and television network broadcasting" and of the adequacy of the Commission's rules governing broadcasting.[2] On July 20, 1955 the Commission adopted Delegation Order No. 10[3] establishing a Committee composed of Chairman McConnaughey and Commissioners Hyde, Bartley and Deofer to conduct this study. The Committee came to be known as "the Network Study Committee". The Commission's order expressly delegated to the Committee, under 47 U.S.C.A. § 155(d) (1), the duty of carrying on the study of radio and television network broadcasting for which the special appropriation had been made, with the same powers and jurisdiction conferred by law on the Commission itself. It may be noted that the Committee consisted of a majority and a quorum of the Commission. 47 U.S.C.A. § 154(a, h).

On November 21, 1955 the Network Study Committee adopted its "Order No. 1"[4] instituting an investigation under the authority of 47 U.S.C.A. § 403, to obtain information "necessary to discharge its [the Federal Communications Commission's] proper functions and duties." The order and its accompanying Public Notice[5] set forth the basic guidelines for the investigation and indicate the objects, purposes and subject matter of the inquiry deemed necessary effectively to implement the mandate of the Commission under the Delegation Order. The Public Notice stated that:

"Basically, the Network Study will concern itself with the broad question whether the present structure, composition and operation of radio and television networks and their relationships with their affiliates and other components of the industry, tend to foster or impede the maintenance and growth of a nationwide competitive radio and television broadcasting industry."

The Committee determined that as far as possible its inquiry should encompass "a comprehensive factual analysis of the broadcasting industry as a whole." It stated that if the study was to be genuinely effective it "should not be limited to the network organizations, as such, and their activities and operations, but, as well, that it should embrace all of the relationships between the several networks; the relationship between the networks and their owned and operated stations as well as their affiliated stations; and the activities of advertising agencies functioning in the field of broadcasting, talent agencies, national spot representatives and the producers and distributors of television programs."[6]

Respondent corporations, Screen Gems, Inc., Revue Productions, Inc., Ziv Television Programs, Inc., and MCA–TV, Ltd., are engaged largely, if not entirely, in the business of producing and distributing motion pictures and programs for television broadcasts. Their productions include a number of well-known and widely exhibited entertainment features such as the Ford Theatre, Adventures of Rin Tin Tin, Circus Boy, Father Knows Best, Highway Patrol, filmed features of the Playhouse Ninety series, etc.

2. Independent Offices Appropriation Act, 1956, Pub.L.No. 112, 84th Congress, 1st Sess. (1955), 69 Stat. 201–202. Congress subsequently granted the Commission an additional appropriation of $141,000 for this purpose for the fiscal year 1957. Independent Offices Appropriation Act, 1957, Pub.L.No. 623, 84th Cong., 2nd. Sess (1956), 70 Stat. 341, 342.

3. F.C.C. 55–810.

4. F.C.C. 55M–978.

5. F.C.C. 55M–977.

6. Network Study Committee Order No. 2 (Memorandum Opinion and Order), F.C.C. 57M–488, Docket No. 11960; Network Study Committee Order No. 1 and Public Notice, supra, notes 4 and 5.

These producers are independent of the television networks. The networks have no financial interest in them nor they in the networks. They obtain television rights to stories, revise such stories to make them suitable for television film production or programming, and work up an end product. In addition, some of the respondents also acquire feature films for television distribution and some "live" shows are produced.

The end product must then be distributed. Occasionally respondents license or sell a program for network exhibition, which involves the telecast of a print and its simultaneous reception in many cities across the country through coaxial cable or micro-wave relay. In most instances respondents' customers are either the sponsors of products advertised in conjunction with the exhibition of the films or local stations (most of which are affiliates of the networks), who in turn dispose of them to local or regional advertisers or to national advertisers on a "spot" basis. When so "syndicated" film is shipped to individual stations by the respondents to be shown at such times as the station determines. Occasionally film is shown simultaneously over networks in some cities, and, in other localities, is exhibited at different times as a syndicated property.

In some instances independent producers or distributors may enter into joint profit-sharing arrangements with the networks concerning a particular program.

In December 1956 the Network Study Committee mailed a "TV Program Questionnaire No. 1" to the respondents and others similarly engaged in the independent production and distribution of television programs. The questionnaire sought detailed information on respondents' business operations. Among other things, it called for statements of profits and losses, production costs, and billings (sales prices) to every customer for every program. It contained numerous questions relating to the types of programs produced, the names of the customers who used them and the terms on which they were used.

Respondents conferred with the staff of the Committee and agreed to supply it with much of the information requested. However, they steadfastly insisted on their right to withhold detailed financial information regarding their operations, and particularly the details of their production costs for specific programs and of their dealings with and prices charged to specific customers.

On March 20, 1957 the Communications Commission made an order *en banc* [7] reciting the negotiations between its Network Study Committee and the respondents and the position which respondents had taken, and authorizing and directing the Committee to institute a formal investigatory proceeding pursuant to 47 U.S.C.A. § 403. It also authorized the Committee to employ compulsory process pursuant to § 409(e).

Pursuant to that order the Committee, on April 23, 1957 adopted "Network Study Committee Order No. 2".[8] This order constituted Chief Examiner Cunningham of the Commission as a "board" within the meaning of 47 U.S.C.A. § 155(d) (1), and directed him to conduct an investigatory hearing on May 1, 1957. The subpoenas duces tecum involved here were then issued by Commission Chairman McConnaughey, as previously indicated, returnable before the "board" at its hearing on May 1.

On the return date the respondents appeared specially by counsel and filed motions to quash the subpoenas on grounds similar to those which they raise here. The presiding officer, by Memorandum Opinion and Order [9] dated May 21, 1957, found that "the several grounds urged by respondents in support of their motions are without merit", denied the motions and ordered those under subpoena to appear before him at

7. F.C.C. 57–281, Docket No. 11960.

8. F.C.C. 57M–388, Docket No. 11960.

9. F.C.C. 57M–488, Docket No. 11960.

the United States Court House in this District, and to produce the material called for by the subpoenas. Two days later several of the respondents petitioned the full Commission for a review of the presiding officer's order and opinion. On June 5, 1957 the Commission adopted its order previously referred to, which denied the petitions for review, confirmed the subpoenas as continuing in full force and effect, and ordered the respondents to appear before the presiding officer on June 12, 1957 with the material described in the subpoenas.

On the return day the respondents appeared by counsel and refused to comply with the subpoenas, announcing that they were prepared to test their validity. The Commission then brought this proceeding to enforce the subpoenas and its order confirming them.

Respondents do not seriously contend that they are altogether beyond the subpoena power of the Commission or that there are not legitimate inquiries which the Commission may make of them. They do not deny that the Commission can inquire as to their affiliations with the networks and presumably with individual stations. Indeed, respondents have gone farther and are prepared, on what they insist to be a voluntary basis, to furnish the Commission with a substantial amount of information concerning their general business activities.

They assert, however, that the jurisdiction of the Commission under the Communications Act of 1934, as amended (Act of June 19, 1934, c. 652, 48 Stat. 1064–1105, as amended) is basically confined to the licensing and regulation of broadcasting in its various aspects, that is to say, with the transmission of radio and television programs over the air and that since they merely supply programs for such transmission, in some instances to sponsors or advertisers and in other instances to the broadcasting stations, and are not licensees or permittees of the Commission, the Commission has no more power to require them to disclose the intimate details of their business affairs than it would to compel manufacturers or suppliers of equipment used in such broadcasting, or one who sold stationery or motor cars to the broadcasters to make such disclosure. They say that if they may be compelled to disclose valuable business secrets to the Commission there is no good reason why the Commission may not compel similar disclosures from, for example, a grocery chain or cosmetic manufacturer who advertises over the air.

Respondents' argument has considerable appeal and illustrates the necessity for drawing lines between the protection of the public interest within the proper confines of the powers granted by Congress to an administrative body such as the Commission, and the rights of individual businessmen to pursue their legitimate business activities without being subjected to unnecessary and harassing government inquisition. There are many instances where the drawing of such lines might exclude agencies of the Government from pursuing inquiries into purely private business affairs, absent sufficiently broad or sufficiently defined grant of power by Congress concerning subject matter within the realm of the public interest. In the case at bar, however, respondents seem to me to come within the framework of the powers of inquiry granted by Congress to the Federal Communications Commission upon subject matter which vitally affects the public interest.[10] Under these circumstances the rights of the individual businessman to. privacy in his business affairs must yield to the paramount public interest.

As the Supreme Court stated in National Broadcasting Co. v. United States,

10. "The 'public interest' to be served under the Communications Act is * * * the interest of the listening public in 'the larger and more effective use of radio'.

§ 303(g)." National Broadcasting Co. v. United States, 319 U.S. 190, 216, 63 S. Ct. 1009.

319 U.S. 190, 217, 63 S.Ct. 997, 1010, 87 L.Ed. 1344:

"The avowed aim of the Communications Act of 1934 was to secure the maximum benefits of radio to all the people of the United States. To that end Congress endowed the Communications Commission with comprehensive powers to promote and analyze the vast potentialities of radio."

In pursuance of these broad aims the Act vests in the Commission three broad functions: (1) the granting of construction permits and station licenses, or modifications or renewals thereof, for broadcasting stations where the Commission determines that the public interest, convenience and necessity would be served thereby (47 U.S.C.A. §§ 307, 309, 316); (2) the adoption of rules and regulations not inconsistent with the Act as may be necessary in the execution of the Commission's functions (47 U.S.C.A. §§ 154(i), 303(f)), including the making of such special regulations applicable to radio stations engaged in chain broadcasting as public interest, convenience or necessity requires (47 U.S.C.A. § 303(i)); and (3) making specific recommendations to Congress as to additional legislation which the Commission deems necessary or desirable, and commenting, at the request of Congress, upon proposed legislation (47 U.S.C.A. § 154(k) (5)). These powers imply "the grant of all means necessary or appropriate" to their discharge. Stahlman v. Federal Communications Commission, 75 U.S.App.D.C. 176, 126 F.2d 124, 128.

In 1943 the Federal Communications Commission promulgated its chain broadcasting[11] regulations[12] following an investigation which was begun in 1938.[13] Subsequently, in 1945, the Commission made the chain broadcasting regulations applicable to television broadcasting stations.[14] Despite the developments in radio network broadcasting since 1943 and the rapid growth of television network broadcasting since 1945, the essentials of these rules remain in force. Furthermore, the chain broadcasting regulations, applicable initially to the radio broadcasting industry, were superimposed on television also with but minor modifications. There has been no detailed study in the interim to determine whether radio and television networks are sufficiently similar to justify the application of the same regulatory policies to both media, nor has there been a study to determine whether developments in radio network broadcasting during the past fifteen years necessitated a modification of the chain broadcasting regulations.

From this background there emerged Congressional appropriations of $221,000 for fiscal years 1956 and 1957[15] for a comprehensive review of the entire network structure in both radio and television broadcasting, and of the adequacy

---

11. "Chain broadcasting" is defined in § 3(p) of the Communications Act as the "simultaneous broadcasting of an identical program by two or more connected stations." 47 U.S.C.A. § 153(p).

12. F.C.C. Order of May 2, 1941, Docket No. 5060. Although the rules were formulated as early as of this date (1941) they remained suspended until final Supreme Court disposition of a suit by CBS and NBC to enjoin their enforcement. See National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997.

13. On March 18, 1938, the Federal Communications Commission authorized (FCC Order No. 37) an immediate investigation "to determine what special regulations applicable to radio stations engaged in chain and other broadcasting are required in the public interest, convenience or necessity * * *". It should be noted that the Communications Act does not expressly delegate to the Commission the power to regulate networks. The chain broadcasting regulations stem from the Commission's power to regulate the stations it licenses to serve the public interest and are therefore necessarily directed against practices of the individual stations engaged in chain broadcasting or network ownership of stations.

14. See 11 F.R. 33 (January 1, 1946).

15. Supra, note 2.

of the Commission's rules governing broadcasting. While the Network Study Committee has indicated that the basic objective of the study is to determine "whether the present structure, composition and operation of radio and television networks and their relationships with their affiliates and other components of the industry tend to foster or impede the maintenance and growth of a nationwide competitive radio and television broadcasting industry," [16] it is manifest that the information necessary to make that determination will also provide a basis for reappraising the chain broadcasting regulations. This broad study, if it is to be successful, must, by definition, cover more than just the networks *in vacuo* but must view them in their proper setting and perspective. If the Committee's study is to be effective, if its results are to enable the Commission to (a) reappraise the chain broadcasting regulations, (b) to determine whether rule-making proceedings should be initiated, and, if so, in what respects the rules should be changed, and (c) to make such recommendations as may be necessary for changes in the Communications Act, the Committee must undertake a *complete* study of the networks.[17] This necessarily involves a study of their relationship with all components of the broadcasting industry and the impact of one upon another as well as on the public.

▆▆▆▆ It seems plain that the Commission has been endowed with ample powers to conduct an investigation of the nature of the network study inquiry and that such investigation is in proper furtherance of the duties and functions vested in it by Congress, both under the Communications Act and by virtue of special congressional authorization. Cf. Stahlman v. Federal Communications Commission, 75 U.S.App.D.C. 176, 126 F.2d 124, supra.[18] In furtherance of its powers to investigate, the Commission has been granted full power of subpoena, 47 U.S.C.A. § 409(e). This power is, of course, not confined to those over whom it may exercise regulatory jurisdiction, but to any persons from whom it can obtain information and documents which are relevant and material to its inquiry. The argument of the respondents that they are exempted from the subpoena power of the Commission because the Commission has no regulatory power over them, would be wholly inconsistent with the broad powers of investigation with which the Commission is vested and would circumscribe such power so as to severely restrict its effectiveness. There is no doubt that administrative agencies vested with such powers may, by compulsory process, require the production of information and documents from third persons who are not within their regulatory jurisdictions if the information sought is necessary and relevant to their authorized and lawful inquiry. President of United States v. Skeen, 5 Cir., 118 F.2d 58;[19] United States v. Cream Products Distributing Co., 7 Cir., 156 F.2d 732; cf. Federal Trade Commission v. Tuttle, 2 Cir., 244 F.2d 605; Federal Trade Commission v. Bowman, D.C.N.D.Ill., 149 F. Supp. 624. The public interest to be served by the broad investigation for which Congress has provided would nec-

---

16. Public Notice, supra, note 5.

17. Compare Network Study Committee Order No. 1, supra, note 4, which, in instituting the inquiry, specifically refers to the Commission's functions of licensing, rule-making and reporting upon or recommending legislation to Congress.

18. But cf. Ellis v. Interstate Commerce Commission, 237 U.S. 434, 35 S.Ct. 645, 59 L.Ed. 1036. *Quaere*, however, whether, the authority of Ellis in this area has been weakened by Perkins v. Endicott Johnson Corporation, 2 Cir.,

128 F.2d 208, 214–218, affirmed 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424; see, also, United States v. Cream Products Distributing Co., 7 Cir., 156 F.2d 732, 736.

19. Cf. "As well might it be said an innocent person could not be compelled to testify and produce his books and records before a grand jury." 118 F.2d at page 59. See Kilgore Nat'l Bank v. Federal Petroleum Board, 5 Cir., 209 F.2d 557, 560.

essarily outweigh any intrusion on the private rights of respondents. Cf. Fleming v. Montgomery Ward & Co., 7 Cir., 114 F.2d 384, certiorari denied, 311 U.S. 690, 61 S.Ct. 71, 85 L.Ed. 446.

This brings us to consideration of the second main point which respondents raise—that the material which is sought by these subpoenas is irrelevant and immaterial to the inquiry being conducted by the Network Study Committee. This contention is in part, at least, disposed of by what has already been said concerning the functions and duties of the Network Study Committee and the scope of its inquiry.

The respondents urge, however, that detailed financial data pertaining to their operations could not shed any light on the subject matter of the Committee's inquiry and thus is quite outside its purview.

As has been pointed out, the subject matter of the investigation is network broadcasting in all its aspects which, as has been indicated, is within the legitimate scope of the Commission's powers. The study concerns itself with "the present structure, composition and operation of radio and television networks", their "relationships with their affiliates and other components of the industry", and whether these things "tend to foster or impede the maintenance and growth of a nationwide competitive radio and television broadcasting industry."

█ It seems to me that the material called for by the subpoenas bears a reasonable relation to this subject matter. Plainly the Commission and its staff think that such material does bear such a relationship and their views are entitled to considerable weight. See Walling v. American Rolbal Corp., 2 Cir., 135 F.2d 1003, 1005. Moreover, the conclusions of the Committee and its

staff find support in reason and common sense.

The large independent producers of television programs and shows appear to be in competition with the networks of the country who also produce programs of their own. [20] Moreover, the networks also control to a substantial extent, through their ownership of individual stations, the exhibition of these respondents' films and programs. The exact nature and extent of this competition, and its effects upon radio and television broadcasting, can certainly not be known until the facts with respect to the respondents' operations are in the hands of the Committee. The relevance of the data sought is indicated by the probability that any regulatory or advisory action which the Federal Communications Commission might take on the basis of an investigation conducted without access to this information would be properly subject to the criticism that it was without sufficient factual basis to support it. It is difficult to perceive how the Commission could evaluate the extent and effect of competitive pressures between the respondents and the networks, without detailed information as to the costs and prices of comparable programs produced and distributed by each. The absence of such information would hamper effective and intelligent determination by the Commission both as to action which it should take and as to recommendations to be made to Congress.

One of the respondents has submitted the affidavit of Dr. Louis M. Hacker, the Dean of the School of General Studies at Columbia University, and an eminent economist, who states that after examining all pertinent documents he is of the opinion that the information sought is not relevant to the stated purposes of the network study. But Dr. Hacker's

20. See Network Study Committee Order No. 2, supra, note 6; Presentation Before The Network Study Group of the FCC by Association of Television Film Distributors, Inc., May 31, 1956 entered in the record of the Hearings Before The Antitrust Subcommittee of the Committee on the Judiciary of the House of Representatives, 84th Cong., 2nd Sess. (1956), pp. 4054–4075.

"Our needs are the same as those of the network that also produces some programs and distributes many more." Hearings, supra, at p. 4058.

opinion, though it is to be respected, is not controlling here. It is certainly not entitled to the weight to be given to the expressed views of the Commission and its staff, who on various occasions, have stated unequivocally that this material is relevant and necessary to the successful completion of the task which has been undertaken. I am not prepared to disagree with these "specialists, advised by experts"[21] and to hold that these documents are not pertinent to the inquiry merely because Dr. Hacker and the respondents believe so.

█ It is true that these subpoenas are broad, but broadness alone does not make a subpoena invalid. A subpoena duces tecum may require the production of all documents relevant to an inquiry. Shotkin v. Nelson, 10 Cir., 146 F.2d 402; cf. Brown v. United States, 276 U.S. 134, 143, 48 S.Ct. 288, 72 L.Ed. 500; Consolidated Rendering Co. v. Vermont, 207 U.S. 541, 553–554, 28 S.Ct. 178, 52 L.Ed. 327.

██ Of course the subpoena power must at all times be confined to "the rudimentary principles of justice,"[22] and the courts will plainly refuse to enforce an administrative subpoena which is not within the bounds of reasonableness. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Chapman v. Maren Elwood College, 9 Cir., 225 F.2d 230; N. L. R. B. v. Anchor Rome Mills, 5 Cir., 197 F.2d 447, 449–450. There is a delicate balance between the necessity of obtaining information required in the public interest in furtherance of a lawful inquiry, and the onerous burdens which the furnishing of this information may place on these respondents. But in the case at bar the scales are tipped on the side of the public interest so as to outweigh the burden and inconvenience to the respondents.

Respondents, however, assert that the recent decision of the Supreme Court in Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, puts a more favorable aspect on their position and supports their contention that they are being unjustly subjected to a roving inquisition bearing no relation to the defined subject matter which the Commission, through its Network Study Committee is investigating. They urge that neither the Committee nor the Commission has sustained the burden of showing how the financial data demanded by the subpoenas is relevant to the purposes of the inquiry, and that thus their rights are being invaded contrary to the Watkins decision.

Respondents' reliance on Watkins is misplaced. Here, unlike Watkins, it cannot be said that the Commission, through its Network Study Committee, is seeking information too remote from the terms of the powers granted to it and the duties imposed upon it by Congress, or that, indeed, the mandate of Congress to the Commission, the latter's delegation to its Network Study Committee, and the Network Study Committee's Order No. 1, and its accompanying Public Notice, are comparable to the resolution which the Supreme Court found too vague and ill-defined in Watkins.

The Watkins case held it to be the responsibility of Congress in the first instance to insure that compulsory process is employed only in furtherance of a legitimate legislative purpose. Thus, Congress, in its mandate to its investigatory committees, must spell out such a committee's "jurisdiction and purposes with sufficient particularity". Even more must this be spelled out in the case of administrative agencies acting under a grant of power from Congress.

But as has been indicated, Congress has not been niggardly in providing the Federal Communications Commission with ample authority to conduct investigatory proceedings necessary for the execution of its multiple functions. It is plain that the network study is such

---

21. Per Judge Frank, Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220.

22. Federal Trade Commission v. American Tobacco Co., 264 U.S. 298, 307, 44 S. Ct. 336, 338, 68 L.Ed. 696.

an investigatory proceeding, and, moreover, that Congress has specifically authorized this study by legislative action supplementary to the Communications Act itself. The scope of the inquiry has been amply limited and defined by the Commission's duly designated Committee within the four corners of the powers so granted to the Commission and the subject of inquiry which is immediately under attack falls within the lawful area of that investigation and is relevant and material thereto. The contrast with the situation presented in Watkins is plain and this contrast lends support to the view both that the scope of the inquiry here is amply and properly defined and delimited and that the material sought is within such limitations.

Apart from all this, however, respondents contend that even if the Commission had the power to issue these subpoenas and the material which they call for was within the scope of the investigation being conducted, the subpoenas are invalid because they were not properly issued. They urge that the officer who issued them [23] lacks authority so to do because under the Communications Act the Commission is precluded from delegating authority to issue the subpoenas and can only issue them itself. I see no merit in this argument.

The subpoena power of the Federal Communications Commission is derived from 47 U.S.C.A. § 409. Subdivision (e) of this section provides:

"For the purposes of this chapter the Commission shall have the power to require by subpena the attendance and testimony of witnesses and the production of all books, papers, schedules of charges, contracts,

agreements, and documents relating to any matter under investigation. * * * "

The Commission is defined in 47 U.S.C.A. § 154(a) as the "seven commissioners appointed by the President."

The Commission is authorized to delegate portions of its work, business and functions, as provided in § 155(d) (1):

"Except as provided in section 409 of this title, the Commission may * * * assign or refer any portion of its work, business, or functions to an individual commissioner or commissioners or to a board composed of one or more employees of the Commission, * * *."

The respondents argue that since § 409(e) refers to the issuance of subpoenas by the "Commission", and because § 155(d) (1) does not permit the Commission to delegate any powers granted to it by § 409, only the full Commission acting *qua* Commission may issue subpoenas.

Respondents' argument is based on the rule of statutory construction succinctly stated in United States v. Missouri Pacific R. R. Co., 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322:

"* * * where the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." [24]

But even if this "plain meaning rule" were appropriate here the respondents' argument fails to take into account the provisions of § 409, subdivision (*l*) which also refers to the issuance of subpoenas. That subsection provides, among

---

23. Federal Communications Commission Chairman George C. McConnaughey in his capacity as Chairman of the Network Study Committee.

24. See, also, e. g., Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442; United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 83, 53 S.Ct. 42, 77 L.Ed. 175. But cf. the language of Mr. Justice Holmes in

Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170:
"It is said that when the meaning of language is plain we are not to resort to evidence in order to raise doubts. That is rather an axiom of experience than a rule of law and does not preclude consideration of persuasive evidence if it exists."

other things, that no person shall be excused from attending and testifying or from producing documentary material "before the Commission, or in obedience to the subpena of the Commission, whether such subpena be signed or issued by one or more commissioners, * * *."

The respondents would have the court ignore this language and its manifest effect upon the interpretation to be given to § 409(e). To do so would violate cardinal rules of statutory construction that effect must be given if possible, to every clause and word of a statute (Inhabitants of Montclair v. Ramsdell, 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431; Ex parte Public National Bank, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202; Adler v. Northern Hotel Co., 7 Cir., 175 F.2d 619) and that the meaning of a statute is to be looked for in all sections taken as a whole "and in that posture related to the end in view." United States v. Vivian, 7 Cir., 224 F.2d 53, 56; N. L. R. B. v. Mastro Plastics Corp., 2 Cir., 214 F.2d 462, affirmed 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309, rehearing denied 351 U.S. 980, 76 S.Ct. 1043, 100 L.Ed. 1495.[25] It seems to me plain that if, as § 409(l) provides, a subpoena must be obeyed whether signed or issued by "one or more commissioners," it conclusively follows that a subpoena may be validly issued by one Commissioner, and that the Commission can certainly authorize one Commissioner to do so.

Moreover, the more recent Supreme Court cases indicate that the so-called plain meaning rule referred to in United States v. Missouri Pacific R. R. Co., supra, is not to be used to thwart or distort the intent of Congress by excluding from consideration enlightening material from the legislative files. Thus, for example, the court, in United States v. American Trucking Ass'ns, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, noted:

"When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'"[26]

In the present instance the meaning of the phrase "Except as provided in section 409" used in Section 155(d) (1) cannot be determined by looking only to the texts of §§ 155(d) (1) and 409(e) quoted by the respondents somewhat out of context, even if the language of § 409(l) be disregarded.

Even a "superficial examination" of § 409 indicates that subsections (a), (b), (c) and (d) deal with a single subject matter—cases of adjudication (as defined in the Administrative Procedure Act, 60 Stat. 237 et seq., 5 U.S.C.A. § 1001 et seq.) which have been designated for a hearing. For most purposes they are quite independent of the other nine subsections. These four subsections specifically limit the Commission's power to delegate functions in "cases of adjudication". They were added to the Communications Act of 1934 by the Act of July

---

25. "We are not at liberty to construe any statute so as to deny effect to any part of its language. It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant.' This rule has been repeated innumerable times. Another rule equally recognized is that every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each." Market Co. v. Hoffman, 101 U.S. 112, 115–116, 25 L.Ed. 782.

26. "It would be anomalous to close our minds to persuasive evidence of intention on the ground that reasonable men could not differ as to the meaning of the words. Legislative materials * * * can scarcely be deemed to be incompetent or irrelevant." United States v. Dickerson, 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356. See, also, Helvering v. New York Trust Co., 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361.

16, 1952, 66 Stat. 711. This amendment of the 1934 Act also added the phrase "Except as provided in section 409 of this title * * * *" to § 155(d) (1). This new phrase was apparently intended to refer to the four new subsections then added rather than to the subsections which were already in the 1934 Act and which were left unchanged.[27] This is borne out by the legislative background of the 1952 amendment. The House Committee, referring to § 155 said:

> "An important difference from the present law is that the power to assign work, business, and functions to panels, individual commissioners, or boards will be subject to a new requirement placed in section 409(a) of present law. This requirement is that in any case of adjudication (as defined in the Administrative Procedure Act) which has been designated for hearing by the Commission, the hearing must be held either by the entire Commission or by one or more examiners appointed as provided in section 11 of the Administrative Procedure Act and may not be held by a single commissioner or by a panel of the Commission." [28]

The Statement of the Managers on the Part of the House, which accompanied the Conference Report, says, with regard to the amendment of Section 155 which was finally adopted, that making the authority of the Commission to delegate subject to the provisions of amended Section 409 of the Act, "would have [sic] denied to the Commission the authority to assign, under this provision, the function of conducting a hearing in any case of adjudication (as defined in the Administrative Procedure Act)." [29]

When this material is read in the light of the fact that Congress left the language of § 409(l) unchanged in 1952 [30] it seems beyond cavil that the statute does not confine the Commission to issuing subpoenas *en banc*.

The subpoenas under attack here were issued by the Chairman of the Commission in his capacity as Chairman of the Network Study Committee. This Committee consisted of himself and three other Commissioners, a majority of the Commission. This is not a case where subpoenas were issued by some minor subordinate. As member and Chairman he had full power to issue them and, indeed, he was authorized to do so by the full Commission. In my view they were properly and validly issued.

But were there any doubt on this score any defects would be cured by the Commission's order of June 5, 1957, which the Commission also seeks to enforce in this proceeding pursuant to 47 U.S.C.A. § 401(b). This order specifically directed the respondents to appear before the presiding officer and to produce the material specified by the subpoenas. It was a valid order of the Commission regularly made and duly served and which was adopted after the respondents had been heard with respect to their objections to the original subpoenas. The Commission's order is enforcible in this court under § 401(b) whether or not the Network Study Committee or the Chairman of the Commission, acting for the Committee, had the power in the first instance to issue the subpoenas under challenge. 47 U.S.C.A. §§ 154(i), 403.

There remains for consideration respondents' appeal to the discretion of the court to limit the material they are required to produce.

Subpoenas of an administrative agency, though validly issued, need not be enforced precisely according to their

---

27. Cf., Sen.Rep. No. 44, 82nd Cong., 1st Sess. (1951), pp. 13–14.

28. H.Rep. No. 1750, 82nd Cong., 2nd Sess. (1952), p. 6, U.S.Code Congressional and Administrative News, 1952, pp. 2234, 2239.

29. H.Rep. No. 2426, 82nd Cong., 2nd Sess. (1952), p. 18, U.S.Code Congressional and Administrative News, 1952, p. 2259.

30. Cf. 48 Stat. 1064, § 409(i).

terms or without modification. Whenever it is made to appear that a subpoena is so broadly drawn as to be oppressive and unreasonable it is the duty of the court to prevent abuse of its process and to place such limitations upon the subpoena as is just and right under all the circumstances. N. L. R. B. v. Anchor Rome Mills, 5 Cir., supra, 197 F.2d at page 449; see Kilgore National Bank v. Federal Petroleum Board, 5 Cir., 209 F. 2d 557, 560; cf. Chapman v. Maren Elwood College, 9 Cir., 225 F.2d 230, supra; Walling v. American Rolbal Corp., 2 Cir., 135 F.2d at page 1005, supra. These matters are in the court's discretion.

While these subpoenas call for a mass of material, the production of which would place a considerable burden upon the respondents, I do not feel that such burden is so great as to be unreasonable and oppressive in the light of the purposes to be served by the network study investigation. The Committee is entitled to see the original factual material and itself evaluate it. It need not be compelled to rely on respondents' summaries or other version of what the basic data shows.

This is " * * * a part of the necessary contribution of the individual to the welfare of the public". Blair v. United States, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979. Any difficulties with respect to time of production of different types of material, the spacing of such production so as to spread the burden over a reasonable period, or as to the form in which data is to be furnished, should be arranged by the Commission with due regard for the exigencies with which respondents may be faced and so as not to interfere unduly with the normal course of their businesses. This should not require the intervention of the court.

I am concerned, however, with that part of the respondents' plea which concerns the possible public disclosure of confidential data relating to specific prices, charged to specific customers for specific programs, the cost of producing specific programs and respondents' profits and losses. The respondents claim, with some reason, that irreparable damage to them will result if such information is disclosed or made public by the Commission.

This is a highly competitive industry. The independent producers, such as respondents, compete not only among themselves but also with the networks. Confidential data of this character is in the nature of a trade secret,[31] the disclosure of which might well do great if not irreparable harm to the respondents' businesses as respondents claim.

The fact that such information is in this category does not in itself forbid access to it by an administrative agency lawfully conducting a lawful inquiry for a lawful purpose. But, as the respondents point out, there is no requirement in the Communications Act that such material be kept confidential by the Commission. Nor have the respondents any protection against disclosure of such information except to the extent provided in 18 U.S.C. § 1905, prohibiting officers or employees of federal agencies from disclosing confidential information received by them "in any manner or to any extent not authorized by law." The Commission itself has been candid in saying that, while it would take "all feasible steps" "to avoid public reference to specific programs or figures," "this anonymity might have to be breached in specific situations."

However, the Commission has made no showing that publication of this confidential data would serve any useful purpose, public or otherwise. Indeed, while the data may well aid the Network Study Committee in arriving at the facts on which to formulate conclusions and recommendations it is difficult to see

---

31. 8 Wigmore on Evidence, § 2212 (3d Ed. 1940); 2 Callman, Unfair Competition and Trademarks, § 52.2 (2d Ed. 1950).

how the Commission, the public, or the purposes of the investigation could be served by such disclosure. It would appear that it would not only harm the respondents but give their competitors unfair advantage.

In my view it would be unreasonable and oppressive to require the respondents to disclose such valuable confidential data in a proceeding in which they were not parties but merely witnesses, without affording them greater protection against public disclosure than the Commission has thus far offered them. There are legitimate and proper restrictions which can and should be placed on the voluntary disclosure of such data by the Commission after it has been produced by respondents. Restrictions on voluntary disclosure will not interfere with such compulsory disclosure, if any, as may be required by lawful process or demand.

Thus, while I hold that respondents must produce, on a reasonable time schedule to be worked out with the Commission, all of the data and information called for by the subpoenas, I will, in the exercise of my discretion,[32] impose restrictions upon the voluntary disclosure by the Commission of the data which is confidential. Accordingly, the order to be entered on this opinion will provide that data as to the specific prices, charged to specific customers for specific programs, and as to the production costs of and profits on specific programs, and as to the individual respondents' financial positions and their profits and losses for the periods involved, shall be treated as confidential by the Commission and shall not be voluntarily disclosed or made public by it or any of its agencies.

With this proviso the petition of the Commission to enforce these subpoenas duces tecum is granted. Settle order on ten days' notice.

32. Cf. Shotkin v. Nelson, 10 Cir., 146 F.2d 402, 404; N. L. R. B. v. Anchor Rome Mills, 5 Cir., 197 F.2d 447, 449;
"The proceeding is equitable in character. Equitable considerations should prevail. There is no power to compel a

court to rubberstamp action of an administrative agency simply because the latter demands such action." Chapman v. Maren Elwood College, 9 Cir., 225 F.2d 230, 234.