## FEDERAL TRADE COMMISSION v. BALTIMORE GRAIN CO. SAME v. H. C. JONES CO., Inc. SAME v. HAMMOND–SNYDER CO., Inc.

(District Court, D. Maryland. November 20, 1922.)

No. 301.

1. **Trade-marks and trade-names and unfair competition ☞80½, New, vol. 8A Key-No. Series—Senate Resolution held not to enlarge commission's power to examine papers.**

Senate Resolution No. 133 of December 22, 1921, directing the Federal Trade Commission to investigate certain phases of the marketing and exportation of grain and other farm products, gave the Commission no authority to examine the books and papers of nonpublic service corporations not already given by law.

2. **Searches and seizures ☞7—Federal Trade Commission not authorized to examine papers in general investigation.**

In view of the prohibition of unreasonable searches and seizures, under which general warrants are forbidden, the Federal Trade Commission Act (Comp. St. §§ 8836a–8836k) does not authorize the Commission, in a general investigation of a branch of trade not directed against any particular corporations, to examine the books and papers of nonpublic service corporations engaged in interstate commerce, but to authorize such examination the inquiry must be more or less definite and restricted in character, and if the statute does give such authority it goes beyond the powers of Congress.

Mandamus petitions for writs by the Federal Trade Commission against the Baltimore Grain Company, against the H. C. Jones Company, Inc., and against the Hammond-Snyder Company, Inc. Petition denied.

Robert R. Carman, U. S. Atty., of Baltimore, Md., for plaintiff.

R. E. Lee Marshall, of Baltimore, Md., for defendants.

ROSE, District Judge. In these cases the Federal Trade Commission seeks a mandamus to compel the respondents, each a corporation, the first two of Maryland and the last of Delaware, and each of them engaged in foreign and interstate as well as intrastate trade in grain, to permit the petitioner's agents to examine, inspect, and copy respondents' books of account, records, documents, correspondence, and paper writings relating to or bearing upon their business in interstate commerce, and all letters and telegrams passing between the respondents and the latter's jobber customers throughout the United States, during the calendar year 1921.

The petitions say that the commission on its own motion, determined to gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practice, and management of, the respondents, and to investigate and determine the facts of the relation of each of them to other corporations, individuals, associations, and partnerships. The petitions further represent that the commission is also acting in compliance with resolution No. 133 of the Senate of the United States, passed December 22, 1921, directing it to investigate the margins between farm and export prices; the freight and other costs of handling; the profits or losses of the prin-

cipal exporting firms and corporations and their subsidiary or allied companies and firms; all the facts concerning market manipulations, if any, in connection with large export transactions or otherwise; the organization, ownership, control, interrelationship, foreign subsidiaries, agents, or connections of the concerns engaged in the export of grain, including the extent of their control of the facilities used by them; the organization, methods of operation and agents used by farm buyers of grain in this country; and other data affecting the demand for a foreign disposition movement and use of American exported grain—and report its findings and recommendations thereon as promptly as the various phases of the work are concluded.

[1] In the case of Federal Trade Commission v. P. Lorillard Co., 283 Fed. 999, Judge Manton, sitting in the District Court for the Southern District of New York, has recently elaborately reviewed the statutes and authorities defining or limiting the power of the Federal Trade Commission to compel private corporations to submit their papers to its examination. In that case, the petition of the commission, which was denied, set forth facts legally indistinguishable from those alleged in the one at bar. Here, as there, the resolution of the Senate conferred upon the commission no authority not already given by law. See U. S. v. Louisville & Nashville R. R., 236 U. S. 329, 35 Sup. Ct. 363, 59 L. Ed. 598.

[2] The Federal Trade Commission Act (Comp. St. §§ 8836a–8836k) does empower the commission, upon the direction of the President or either house of Cogress "to investigate and report the facts relating to any alleged violation of the Anti-Trust Acts by any corporation." The resolution cited in the instant case does not suggest any breach of these acts. The question here is whether the statute creating the commission entitles it to the inspection for which it asks, and, if so, whether the act in that respect is valid.

Paragraph A of section 6 of the statute authorizes the commission—

"to gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, * * * and its relation to other corporations and to individuals, associations, and partnerships."

Paragraph H provides that the commission may upon its own motion—

"investigate, from time to time, trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants, or traders, or other conditions, may affect the foreign trade of the United States, and to report to Congress thereon. * * *"

Section 9 declares:

"That for the purposes of this act the commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purposes of examination, and the right to copy any documentary evidence of any corporation being investigated or proceeded against. * * *"

The measure originated in the House of Representatives, and the committee which reported it was familiar with what the Supreme Court had said in Harriman v. Interstate Commerce Commission, 211 U. S.

407, 29 Sup. Ct. 115, 53 L. Ed. 253, and it said that, in order that the proposed Trade Commission—

"may have powers of subpœna and production of books and papers, the language" of the bill "has been expressly made broad enough to permit a full exercise of that power in connection with any kind of investigation which may be undertaken." Report of Committee on Interstate and Foreign Commerce, No. 533, 63d Congress, 2d Session.

The Senate Committee on Interstate Commerce, while recognizing that, in "the conduct of such special investigations as the commission may deem necessary, it is indispensable that it should have extensive powers of inquiry with the right to subpœna witnesses, and require the production of books and papers," concluded that those conferred upon it were practically the same as were then possessed by the Interstate Commerce Commission and by the Bureau of Corporations. Report of Senate Committee on Interstate Commerce, No. 597, 63d Congress, 2d Session.

The legislative history of the act may suggest that Congress did not intend that the powers of the commission to investigate should be confined to cases in which a complaint had been made, or might have been; but there is no reason to suppose that Congress thought that in other respects it was giving any authority which the Interstate Commerce Commission did not possess.

The precise question here to be decided is whether the statute confers upon the commission the right to inspect and copy the papers of any private corporation engaged in interstate or foreign commerce, whenever, in the judgment of the commission, such inspection may furnish information of value to an inquiry it is making as to some economic or commercial problem, and when it has no reason to believe that any violation of law has been committed. There can be no question of the timeliness of an investigation into the causes of the marked difference between the prices received by the grain grower and those paid by the ultimate consumer. Many of the farmers have long been convinced that in some way they were victimized by the railroads and the middlemen. The feeling of resentment has become so strong among them that, in some of the wheat-growing states, it has forced a realignment of political parties and has resulted in the demand for many laws, and the enactment of a number of them, as to the wisdom of which there is still grave difference of opinion. The problems involved are of unusual perplexity. The causes of the evils most complained of are still obscure to many. Congress and the people need all the light they can get. The more thorough the inquiry, the more valuable its results should be, provided the investigators do not gather so much material that they will be unable to see the woods for the trees.

That is one side of the question. There is another. The respondents in these cases are private corporations, by which various individuals more conveniently carry on that trade of corn merchants which antedates the beginning of recorded history. They have and exercise no franchises other than that of being corporations. They are not engaged in rendering public service, except in the sense that such service is rendered by every one who follows any useful calling. To them the

demand that they shall be compelled to let strangers, officials though they be, go through, not only their books of account, but their correspondence files as well, seems outrageous. In their belief, the gain to the public from anything which such an inquiry can probably or possibly reveal, seems slight as compared with the annoyance and sense of wrong it will cause them. If they are right, the search and seizure asked for would be unreasonable and therefore forbidden. The prohibition of unreasonable and the sanction of reasonable search and seizure is simply a practical compromise between two conflicting rights.

For upwards of a century and a half there has been no doubt that general warrants are forbidden. No official can be given authority to rummage through the papers of an individual without the latter's consent, in the hope that something or other may be discovered useful for some public purpose. A corporation's rights as against the sovereign which created it, or permits it to do business within its borders, are not, it is true, the same as those of a natural person. It is the creature of the state. He is not. The state may exclude it, while he may freely come in. As a condition of obtaining a charter or, under some circumstances, of retaining it, or doing business under it, it is probable the state might reserve a right to an unlimited inspection of all a corporation's books and papers. But that question is not here presented. As was said in Silverthorne Lumber Co. v. United States, 251 U. S. at page 392, 40 Sup. Ct. at page 183, 64 L. Ed. 319:

"The rights of a corporation against unlawful search and seizure are to be protected, even if the same result might have been achieved in a lawful way."

It is not necessary for the purposes of the instant case to inquire whether the United States may exercise, over a corporation engaged in interstate or foreign commerce, all the powers which are possessed by the state which chartered it. Even if it may, the wording of the statute, broad and general as in some respects it is, does not suggest that Congress intended to strike down, as respects private corporations engaged in interstate commerce, all the limitations which for 150 years or more had protected private papers from searches under general warrants. Nor is there anything in the legislative history of the act to suggest that the legislators supposed that they were taking so radical a step, or that they were raising a constitutional question of serious and far-reaching character. Unquestionably some of them wanted to authorize the compulsory examination of the papers of a corporation, although no complaint of a specific violation of law was pending against it, or was in contemplation. Very possibly that much could be done, some of the things which were said in Harriman v. Interstate Commerce Commission, supra, to the contrary notwithstanding. Smith v. Interstate Commerce Commission, 245 U. S. 44, 38 Sup. Ct. 30, 62 L. Ed. 135. But so far as concerns nonpublic service corporations, at least, the inquiry in which the commission is engaged, whatever it is, must be more or less definite and restricted in its character, so that the activities of its minor agents, to whom in practice the actual searching must necessarily be confided, can be kept within some bounds. Very possibly, to sustain any right of inspection and searching, it must also appear that there is some reasonable proportion between the pub-

lic value of the information likely to be obtained and the private annoyance and irritation it will occasion.

With these general principles in mind, it will be noted that the act gives the commission power "to investigate the organization, business, conduct, practices and management of any corporation engaged in [interstate or foreign] commerce and its relation to other corporations, and to individuals, associations and partnerships," and that the right of access to papers and books is limited to those of a corporation being investigated or proceeded against. That much of a restriction the statute itself imposes. Whether it may, to that extent, authorize the examination of a private corporation's papers, need not be here considered. These corporations are not being "proceeded" against. Are they, in the sense of the statute, being "investigated"? The investigation which the commission has in hand, and for which it is here seeking information, is, strictly speaking, not of them, or of the scores or perhaps hundreds of other corporations whose papers it wishes to inspect, but of the conditions affecting one of the most important branches of our national trade.

To make such an investigation scientifically complete it may well be desirable to find out precisely how, not only the corporations engaged in it conduct their business, but to obtain the same fullness of information concerning the individuals or firms concerned in it; but the portions of the statute with which we are now dealing give no authority to inspect papers of any natural persons. Is there not a fair presumption that the investigation mentioned in the statute was one of another character than the one now being carried on, and that it was to be an inquiry into the way the particular corporation itself conducted its business, having as its substantial object the ascertainment of facts concerning that corporation, and as its ultimate end the possibility that in some way such corporate body might be required to mend its ways? If that be not the true construction of the act, and if it really means that, whenever the commission thinks best to make an inquiry into the way in which some great department of commerce is carried on, it may send its employees into the office of every private corporation which does an interstate business in that line, and empower them to go through the company's books, correspondence, and other papers, I am satisfied it goes beyond any power which Congress can confer, in this way, at least.

It follows that the petitions for writs of mandamus must be denied.