### THE EQUITABLE TRUST COMPANY ET AL. *v.* STATE OF MARYLAND COMMISSION ON HUMAN RELATIONS

[No. 53, September Term, 1979.]

*Decided February 11, 1980.*

The cause was argued before SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Stanley Mazaroff,* with whom were *George W. Johnston* and *C. Thomas Williamson, III* on the brief, for appellants.

*Risselle Rosenthal Fleisher, General Counsel,* with whom was *Louis A. Young, Assistant General Counsel,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that the Commission on Human

Relations failed to comply with a statutory prerequisite for the filing of a complaint on its own motion. Hence, we shall reverse the judgment of the Court of Special Appeals in *Equitable Tr. v. State of Md. Comm'n,* 42 Md. App. 53, 399 A.2d 908 (1979). For the guidance of trial courts, we shall also discuss the alleged burdensomeness of the subpoena which the Commission here sought to enforce.

The Commission on Human Relations is created and governed by Maryland Code (1957, 1979 Repl. Vol., 1979 Cum. Supp.) Art. 49B. On its own motion it filed a complaint against The Equitable Trust Company (styled as "Equitable Trust Bank" in the complaint). It was served on Equitable on December 18, 1974. The complaint in question was signed by the chairman and three members of the Commission.[1] In this instance there appear to have been no individual complaints similar to the Commission complaint filed against Equitable. Thus, this case is readily distinguishable from *Banach v. St. Comm'n on Human Rel.,* 277 Md. 502, 356 A.2d 242 (1976), where we upheld a subpoena issued in connection with a preliminary investigation pursuant to individual complaints.

In October of 1976, reciting the authority of Maryland Code (1957, 1972 Repl. Vol., 1974 Cum. Supp.) Art. 49B, § 14 (d)

---

1. The complaint in its entirety states:

 The above named financial institution is subject to the jurisdiction of the Maryland Commission on Human Relations acting in accordance with Section 12 (b) of Article 49B of the Annotated Code of Maryland.

 We have reason to believe the above named financial institution has engaged in unlawful application of financial standards, terms, and conditions regarding mortgage financing, personal credit, and all other forms of credit to individuals and classes protected by Article 49B. Such unlawful practices have the effect of causing differential treatment in credit evaluation and the determination of credit worthiness of racial minorities and the protected sex class.

 An investigation of said practices shall be undertaken pursuant to Article 49B of the Annotated Code of Maryland. This investigation shall examine and look into the specific facts and circumstances concerning the holding of different standards of creditworthiness for men and for women, differential evaluation of income of males and females, and refusing services to females when changes are made in marital status. On the basis of investigation into these facts and circumstances the Maryland Commission on Human Relations will determine whether there is probable cause to believe that there is validity to the complaints.

(now found in the 1979 Repl. Vol. as Art. 49B, § 11 (d)), the Commission issued a subpoena to Equitable directing the production of a number of documents "for the period January 1975 through December 1975 unless otherwise specified." [2]

---

2. The subpoena stated in relevant part:

Please supply information for consumer loans, auto loans, mortgage loans and Bank Americard unless otherwise specified.

(1) Any and all documents, memoranda and other writings or copies thereof containing policy, instructions and establishing practices to be followed by the bank in providing the following lending services application through final determination for:
 a. automobile loans
 b. Bank Americard
 c. consumer loans
 d. mortgage loans

(2) Any records memoranda or correspondence compiled by the bank which indicate the race, sex and marital status of applicants for loans which were approved by the bank during the above referenced period.

(3) Any and all records, memoranda, or correspondence showing the race, sex and marital status of applicants for loans which were not approved.

(4) Any and all records memoranda or correspondence showing the criteria and standards used to score and evaluate applicant's qualification.

(5) Any and all documents, memoranda and other writings or copies thereof used to obtain personal information (credit, character references and job verification on loan applicants) including names of any other information resources or data organizations.

(6) Copies of any and all announcements and or advertisements used to publicize lending services.

(7) Any and all documents, policies, correspondence, memoranda and other writings used in response to changes in the marital status of credit card customers and loan applicants.

(8) Any and all documents, memoranda, instructions and other writings pertaining to income requirements of loan applicants and their spouse.

(9) Any and all documents, memoranda, instructions and other writings pertaining to the income requirements of unmarried loan applicants.

(10) Any and all documents, memoranda, instructions and other writings pertaining to the use of co-signers and their qualifications.

(11) All Bank Americard applications for the period from January 1975 through December 1975.

(12) All mortgage loan applications for the period from January 1974 [sic] through December 1975.

(13) All automobile loan applications from January 1975 through December 1975.

(14) All consumer loan applications from January 1975 through December 1975.

When the requested items were not produced, the Commission docketed a suit in the Circuit Court of Baltimore City seeking an order directing the production of the documents. That petition recited, among other things, that Equitable's activities came "within the purview of Section 11C of Article 49B" (now Code (1957, 1979 Repl. Vol.) Art. 49B, § 8); that pursuant to what was then Art. 49B, § 12 (b) (now § 9 (b)) "the Commission ha[d] received reliable information that Defendant is engaged in discriminatory practices within the scope of Section 11C of Article 49B, and a duly authorized preliminary investigation was conducted"; that "[p]ursuant to this investigation, a Commission complaint issued and was served on Respondent on December 18, 1974"; that the information sought was "deemed relevant and necessary to complete promptly an investigation of the aforesaid complaint," and that Equitable had "refused to cooperate with the Commission's investigation of the complaint." Equitable responded with a number of defenses. It filed an affidavit of its executive vice-president (described in the Commission's petition as "the officer in charge and believed to be the custodian of the records sought by the Petitioner") in which he recited the vast amount of work and the substantial cost which would be necessary to produce the required information.[3]

---

(15) Any and all records containing the name, location, race and sex of all persons responsible for:
 1. establishing loan policy and practice,
 2. establishing the criteria for loan risks,
 3. evaluating credit applications,
 4. final approval of loan applications and
 5. appeals for rejection of applications.

3. The relevant portion of the affidavit states:
 4. Compilation of the records sought in this proceeding would require review of the records of three separate Bank departments: Bank Americard, Consumer Credit and Mortgage. The records sought are maintained on fiche and are filed by account name or number. Approximately 63,000 accounts are germane to the Commission's subpoena duces tecum. Of this figure 2,875 accounts are located in the Mortgage Department, 36,217 in the Consumer Credit Department and 23,908 in the Bank Americard division. In order to develop the information sought by the Commission a program would have to be constructed for the dates specified in the subpoena to pull the relevant fiches. Once these fiches have been identified, they must be read manually to glean the pertinent

Ultimately the court passed an order directing Equitable to produce all of the requested items other than those pertaining to mortgage loans. (The reason for this latter exception was that a subpoena was already outstanding and ordered enforced in another proceeding pertaining to those documents.) An appeal followed to the Court of Special Appeals. It affirmed. We granted the writ of certiorari in order that we might address the following issues as framed by Equitable:

1. May the Commission validly issue and compel compliance with a subpoena *duces tecum* which seeks documents pertaining to types of financing not regulated by Article 49B . . .?

2. May the Commission validly issue and compel compliance with a subpoena *duces tecum* when its complaint was not made under oath as required by section 9 of Article 49B . . . and §§ 14.03.03(D)(1), .09(A)(1) of the Commission's Rules of Procedure?

3. May the Commission validly issue and compel compliance with a subpoena *duces tecum* which seeks documents which are so voluminous that they would be unduly burdensome for Equitable to provide?

I

The Commission says that its authority to seek these documents stems from the provisions of Code (1957, 1979

---

information. When this information has been culled, it must then be reproduced through photocopying. To accomplish all of these tasks would require expenditure, conservatively estimated, of substantially more than 9,000 work hours.

5. The cost of collating the data sought would be approximately $96,232.00. This cost in part was calculated based on a conservative estimate of $1.25 per item for the manual retrieval of the pertinent fiches. This figure yielded a total cost of $78,750.00. To this cost must be added $11,812.00 for supervisory direction of the project. Finally, $5,670.00 must [be] allotted to cover reproduction costs. All of these figures represent conservative estimates.

Repl. Vol.) Art. 49B, § 8.[4] That section makes it unlawful for one

> licensed or regulated by the Department of Licensing and Regulation as set out under Article 41, ... § 221A (a) "The Department of Licensing and Regulation," to refuse, withhold from, deny or discriminate against any person in the accommodations, advantages, facilities, privileges, sales or services because of the race, sex, creed, color, national origin, marital status, or physical or mental handicap of any person.

Equitable's argument is that the statute originally enacting this section placed it under the "Public Accommodations" subtitle. Since the activities here do not amount to public accommodations, it says the statute is not applicable.

The standards for construing statutes have been set forth by this Court many times. We have indicated that the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent, that in determining that intent the Court considers the language of an enactment in its natural and ordinary signification, and that a corollary to this rule is that if there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly. *See, e.g., In Re: James S.,* 286 Md. 702, 705-06, 410 A.2d 586 (1980), and *Police Comm'r v. Dowling,* 281 Md. 412, 418, 379 A.2d 1007 (1977). There is no ambiguity here; thus there is no reason to look elsewhere for interpretation. Section 8 prohibits, among other things, refusal or withholding of certain advantages from any person. If one denies an individual an automobile loan or a credit card because of his race or sex, as the complaint alleges has been done, then it certainly follows that he has been denied an advantage. It is conceded that Equitable is subject to regulation by the Bank Commissioner, who is assigned by Code (1957, 1978 Repl. Vol.) Art. 41, § 221A (a) to the

---

4. Henceforth, we shall refer to the sections of Art. 49B as they appear in the 1979 Repl. Vol. of the Code. Chapter 684 of the Acts of 1978 renumbered many of the sections of Art. 49B.

Department of Licensing and Regulation. Hence, this argument is without merit.

## II

The Commission conceded at oral argument that it did not seek its subpoena here as a part of a preliminary investigation under § 9 (b) as was the case in *Banach,* 277 Md. 502, but it seeks the subpoena pursuant to its investigation of a complaint filed by the Commission on its own motion. Equitable counters by saying, correctly, that the complaint is not under oath. The Commission contends its complaint is not required to be under oath.

Art. 49B, § 9 states in pertinent part:

(a) Any person claiming to be aggrieved by an alleged discrimination prohibited by any section of this article may make, sign and file with the Human Relations Commission (hereinafter referred to as the "Commission") a complaint in writing under oath. The complaint shall state the name and address of the person, ... [or] corporation, ... alleged to have committed the act of discrimination together with the particulars thereof .... A complaint must be filed within six months from the date of the occurrence alleged to be a violation of this article. A complaint filed with the federal or with a local human relations commission within six months from the date of occurrence shall be deemed to have complied with the provisions of this section.

(b) Whenever the Commission has received reliable information from any individual ... that any person has been engaged ... in any discriminatory practice within the scope of this article, and after a preliminary investigation by the Commission's staff authorized by the chairman ... it is satisfied that said information warrants the filing of a complaint, the Commission, on its own motion, and by action of not less than three commissioners, may issue a complaint in its name in the same manner as if the complaint had been filed by an individual.

To the principles relative to statutory construction which we set forth in part I of this opinion we add that a court may not insert or omit words to make a statute express an intention not evidenced in its original form; the General Assembly is presumed to have had, and acted with respect to, full knowledge and information as to prior and existing law and legislation on the subject of the statute and the policy of the prior law; and, absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory. *In Re: James S. supra,* 286 Md. at 705, and *Dowling,* 281 Md. at 419.

The Commission would have us read the words "in the same manner as if the complaint had been filed by an individual" as requiring it to state the name and address of the one "alleged to have committed the act of discrimination together with the particulars thereof" and no more. It says that the oath requirement is in no way applicable. Apparently, the Commission desires to pick and choose which of the requirements in § 9 (a) are applicable to its own complaint under § 9 (b). If the Commission is correct in its construction of what portion of § 9 (a) is applicable to a complaint filed by it on its own motion, then following its argument to its logical conclusion the Commission could file a complaint without the necessity of signature by any commissioner (so long as at least three approved) and there would be no six-month limitation requirement as set forth in § 9 (a). However, the command of the statute is that the complaint is to be issued "in the same manner as if the complaint had been filed by an individual." We perceive the General Assembly as having intended to assure persons against whom the Commission issued a complaint that the charges were not lightly made, that they were not issued upon the whim, fantasy, or prejudice of certain of the commissioners. Hence, the commissioners would be making oath that they were in possession of reliable information sufficient for a reasonable belief that a person may have been engaged in a discriminatory practice within the scope of Art. 49B. There is no other way that the statute can be interpreted without

running afoul of the oft expressed principle that "absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory." The foundation of the Commission's petition to enforce the subpoena was that after receipt of reliable information relative to Equitable's having engaged in discriminatory practices and after having conducted a duly authorized preliminary investigation the Commission had issued a complaint. Since the complaint does not meet the requirements of the statute, it follows that it may not be a basis for the issuance of a subpoena. Hence, the Circuit Court of Baltimore City should have declined to enforce the subpoena.

## III

We note an increasing number of cases involving requests on behalf of administrative agencies for subpoenas such as that in the case at bar. Therefore, although we have held in this case that the subpoena should not have issued, pursuant to Maryland Rule 885 we shall set forth our views on the issue of burdensomeness for the guidance of trial judges.

Many things have changed since 1921, not least of which is the attitude of courts in the matter of subpoenas on behalf of administrative agencies. A landmark case of that era involved the attempt by the Federal Trade Commission to subpoena from American Tobacco Company all letters and telegrams received by it from its jobbers during 1921. The Supreme Court unanimously refused to enforce the subpoena, holding that a showing of probable cause and the relevancy of the documents requested was essential. The FTC was acting pursuant to a Senate resolution which directed the investigation of the domestic and export tobacco trade. By preexisting statute the FTC was authorized, among other things, to gather information upon the direction of either House of Congress. The statute authorized it to require "the production of all such documentary evidence relating to any matter under investigation." Mr. Justice Holmes said for a

unanimous Court in *Fed. Trade Comm. v. Amer. Tobacco Co.,* 264 U.S. 298, 44 S. Ct. 336, 68 L. Ed. 696 (1924):

> Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire (*Interstate Commerce Commission v. Brimson,* 154 U.S. 447, 479), and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. We do not discuss the question whether it could do so if it tried, as nothing short of the most explicit language would induce us to attribute to Congress that intent. The interruption of business, the possible revelation of trade secrets, and the expense that compliance with the Commission's wholesale demand would cause are the least considerations. It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up. The unwillingness of this Court to sustain such a claim is shown in *Harriman v. Interstate Commerce Commission,* 211 U.S. 407, and as to correspondence, even in the case of a common carrier, in *United States v. Louisville & Nashville R.R. Co.,* 236 U.S. 318, 335. The question is a different one where the State granting the charter gives its Commission power to inspect.
>
> The right of access given by the statute is to documentary evidence — not to all documents, but to such documents as are evidence. The analogies of the law do not allow the party wanting evidence to call for all documents in order to see if they do not contain it. Some ground must be shown for supposing that the documents called for do contain it. [*Id.* at 305-06.]

Of local interest is the holding of Judge Rose to the same effect in *Federal Trade Commission v. Baltimore Grain Co.,* 284 F. 886 (D. Md. 1922). In a similar investigation conducted

at about the same time as that of the American Tobacco Co. and under similar authority, the FTC sought the production by Baltimore Grain Company of its books, letters, and telegrams from its jobbers during 1921. Judge Rose found that the Congress was without power to authorize so broad an inquiry without probable cause, observing that "to sustain any right of inspection and searching, it must also appear that there is some reasonable proportion between the public value of the information likely to be obtained and the private annoyance and irritation it will occasion." *Id.* at 889-90.

It will be noted that *American Tobacco* and *Baltimore Grain* rested upon the view that the Fourth Amendment proscribed unreasonable searches and seizures. By the time that *Okla. Press Pub. Co. v. Walling,* 327 U.S. 186, 66 S. Ct. 494, 90 L. Ed. 614 (1946), reached the Court, its views toward administrative "fishing expeditions" had mellowed somewhat. There the Wage and Hour Administrator sought full payroll data and information about the source of the corporation's advertisements and news. The Court noted:

> It is claimed that enforcement would permit the Administrator to conduct general fishing expeditions into petitioners' books, records and papers, in order to secure evidence that they have violated the Act, without a prior charge or complaint and simply to secure information upon which to base one, all allegedly in violation of the Amendment's search and seizure provisions. [*Id.* at 195.]

It held that this subpoena of corporate records did not raise the Fourth Amendment issue, pointing out, "No officer or other person has sought to enter petitioners' premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections, which in fact were made." *Id.* It distinguished *American Tobacco,* observing that no objection was taken to the breadth of the subpoenas. *Id.* at 207. It pointed out that corporations do not enjoy the same Fourth Amendment protections as those

enjoyed by individuals, *id.* at 204-05, and that the proper analogy to such investigative subpoenas was the grand jury investigation, not the search upon probable cause. *Id.* at 209.

The principal impact of *Oklahoma Press* is the Court's holding that such subpoenas need not be supported by probable cause but that their validity is to be measured by a three-fold test. Citing *Oklahoma Press,* Judge Levine in *Banach,* 277 Md. at 506, stated for this Court that the test is, "Whether the inquiry is authorized by statute, the information sought is relevant to the inquiry, and the demand is not too indefinite or overbroad." *Accord* Cooper, *Federal Agency Investigations: Requirements for the Production of Documents,* 60 Mich. L. Rev. 187 (1961), and 1 F. Cooper, *State Administrative Law* 299 (1965).

The broad change that has taken place is further illustrated by the pronouncement of the Supreme Court in *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S. Ct. 357, 94 L. Ed. 401 (1950), where Mr. Justice Jackson said for the Court:

> Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.
>
> Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. *Federal Trade Comm'n v. American Tobacco Co., supra.* But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. "The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable." *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 208. Nothing on the face of the Commission's order transgressed these bounds. [*Id.* at 652-53.]

See the discussion of the abrupt change and its implications in 1. K. Davis, *Administrative Law Treatise,* §§ 4.1 and 4.2 (2d ed. 1978). In *Vulcan, Inc. v. Md. Home Imp. Comm'n,* 253 Md. 204, 210, 252 A.2d 62 (1969), we quoted from *Morton Salt* relative to the function of an administrative agency and its investigation, pointing out that the Supreme Court said, "It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* 338 U.S. at 642-43. It goes without saying, however, that an administrative agency may not exceed the powers vested in it. Moreover, in *Vulcan* we returned the case to the trial court to take evidence on Vulcan's allegation that the commission's action there was "malicious, arbitrary and unreasonable."

The question that arises is in what circumstance will the defense of undue burden prevail? Although *Oklahoma Press* clearly curtailed the proscription against "fishing expeditions," its three-fold test actually reaffirmed the requirement that the demands made must not be unduly vague or unreasonably burdensome.

Professor Cooper further explains on the matter of undue burden:

> The Supreme Court in the *Oklahoma Press* case did not define the "unreasonable disclosure" that is proscribed as being oppressive and unduly burdensome. However, applications of this test by the lower courts indicate that the mere circumstance that compliance with the requirements of the subpoena will be expensive and will interfere with the conduct of respondent's business does not in itself often afford a basis for refusal to enforce the subpoena. Rather, the courts take into consideration the character of the administrative investigation, the apparent importance to the agency of the documents in question (*i.e.,* their potential relevancy), and the purpose of the agency in issuing the subpoena. [60 Mich. L. Rev. at 192-93.]

* * *

The courts exhibit diligence in discovering practical means to modify the command of the subpoena, where literal compliance would be unnecessarily burdensome. Among the devices employed toward this end are (1) requirements that the agency take steps to avoid public disclosure of trade secrets revealed to it, (2) provisions for examination of the documents by agency representatives at respondent's place of business, and (3) provisions for production of the documents over a period of time, so that respondent will not be deprived of all his records at once.

While there are dicta in a few cases that inconvenience to respondent is never in itself enough to make the demand unduly oppressive, it appears that if the inconvenience is truly burdensome, the courts will take this into account by requiring the witness to produce only such information as is necessary to the attainment of the proper objectives of the agency. [60 Mich. L. Rev. at 194-195.]

In *Federal Communications Commission v. Cohn,* 154 F. Supp. 899 (S.D.N.Y. 1957), the court upheld a broad subpoena but said, "There is a delicate balance between the necessity of obtaining information required in the public interest and furtherance of a lawful inquiry, and the onerous burdens which the furnishing of this information may place on ... respondents." *Id.* at 908. The court had previously commented in that case:

Respondents' argument has considerable appeal and illustrates the necessity for drawing lines between the protection of the public interest within the proper confines of the powers granted by Congress to an administrative body such as the Commission, and the rights of individual businessmen to pursue their legitimate business activities without being subjected to unnecessary and harassing government inquisition. There are many instances where the drawing of such lines

might exclude agencies of the Government from pursuing inquiries into purely private business affairs, absent sufficiently broad or sufficiently defined grant of power by Congress concerning subject matter within the realm of the public interest. [*Id.* at 904.]

In *Adams v. F.T.C.,* 296 F.2d 861 (8th Cir. 1961), the Federal Trade Commission had issued a complaint alleging price fixing from 1940 through 1959 and a broad subpoena in connection with the complaint covering that entire period. The court recited the three-prong test of *Oklahoma Press,* cited *Cohn,* and declared that the trial court "must determine whether the subpoena power has been confined to the rudimentary principles of justice." *Id.* at 866. It said in the process of its discussion:

If it is made to appear that the demand is too indefinite or that the data sought is not reasonably relevant, the agency action is generally regarded as being unreasonable and arbitrary, and the courts will deny enforcement. As stated in the Cohn case, supra, "Of course the subpoena power must at all times be confined to 'the rudimentary principles of justice,' and the courts will plainly refuse to enforce an administrative subpoena which is not within the bounds of reasonableness." 154 F. Supp. 908. "The process is lawful if it confines its requirements within the limits which reason imposes in the circumstances of the particular case." McGarry et al. v. Securities and Exchange Commission, supra, 147 F.2d at p. 392. [*Id.* at 866.]

The court cut back on the time period covered by the subpoena, limiting it to 1954 through 1959 rather than from 1940, concluding that this would adequately serve the Commission's investigative purpose. Its further action to alleviate the burden on Adams included: (1) with respect to material that had to be audited, making the respondent's books available to the Commission "so that it m[ight] do the work"; and (2) with respect to materials that were duplicative

of materials that Adams had earlier supplied a congressional committee, requiring the Commission to get the items from that source.

Other courts have restricted subpoenas. For instance, the Internal Revenue Service conducted an investigation of professional tax preparers. 26 U.S.C. § 7602 provided that summons might be issuable "[f]or the purpose of ascertaining the correctness of any return . . . determining the liability of any person." An inaccurate return was made for an undercover Internal Revenue agent. The Internal Revenue Service issued a cease and desist order and then sought to subpoena all of the returns prepared by that defendant for its clients over a three-year period, together with all accompanying memoranda. In *United States v. Theodore,* 479 F.2d 749 (4th Cir. 1973), Judge Soboleff (a former Chief Judge of this Court) said for the Fourth Circuit in reversing a trial court's order directing enforcement of the subpoena:

> [T]he Internal Revenue Service is not to be given unrestricted license to rummage through the office files of an accountant in the hope of perchance discovering information that would result in increased tax liabilities for some as yet unidentified client. Section 7602 summonses were not meant to give the IRS such investigative and inquisitorial power.
>
> A summons will be deemed unreasonable and unenforceable if it is overbroad and disproportionate to the end sought. United States v. Harrington, 388 F.2d 520, 523 (2 Cir. 1968). The Government cannot go on a "fishing expedition" through appellants' records, United States v. Dauphin Trust Co., 385 F.2d 129 (3 Cir. 1967); *contra* United States v. Giordano, 419 F.2d 564 (8 Cir. 1969), and where it appears that the purpose of the summons is "a rambling exploration" of a third party's files, it will not be enforced. *See* United States v. Harrington, *supra.* [*Id.* at 754.]

Trial judges generally are vested with a wide range of discretion. This is no less so in their determination of the relevance or oppressiveness of agency subpoenas. Because they are on the scene and intimately acquainted with the details at the time, they are in a better position than are appellate judges to evaluate such an issue as oppressiveness or burdensomeness and to contrive means of lessening the burden and yet at the same time permitting investigations to go forward. As Judge Davidson recently said for the Court of Special Appeals in *Cocco v. Maryland Comm'n on Med. Discipline,* 39 Md. App. 170, 178-79, 384 A.2d 766 (1978), *rev'd in part on other grounds sub nom. Unnamed Physician v. Comm'n,* 285 Md. 1, 400 A.2d 396, *cert. denied,* 444 U.S. 868, 100 S. Ct. 142 (1979), "Under appropriate circumstances, trial courts may modify subpoenas issued by administrative agencies," citing *Cohn* and referring to yet other cases.

An example of trial court action to relieve the oppressiveness of an agency subpoena is *Hunt Foods and Industries, Inc. v. F.T.C.,* 286 F.2d 803 (9th Cir. 1961). The Federal Trade Commission had sought "[a]ll records and documents . . . pertaining to each transaction in which there has been a payment . . . to customers . . . in connection with the sale and distribution . . . of all brands of processed tomato products" during a period from July 1, 1956, through June 16, 1959. Hunt estimated that this would involve 230,000 transactions and that compliance would involve a four-year task for twenty employees. The district court ordered the FTC to submit a memorandum on how it would undertake to alleviate the burden. That memorandum is set forth as note 8, 286 F.2d at 810-11. In it the FTC agreed that its representatives would be where the various documents were located "during ordinary business hours"; that no more than three FTC representatives would be employed at any one time for this purpose; that it would not be necessary for Hunt's employees "to perform the physical work of withdrawing the specified documents from the various files, unless respondent so elect[ed]"; that FTC "representatives w[ould] not examine all of the various documents covered by specification 1, but w[ould] conduct their examination of these documents by a

sampling method," with the "[s]ample documents to ... be selected by Commission representatives, without restriction, from among the entire group of documents specified"; that "Commission representatives w[ould] also examine the documents covered by specifications 3 and 4, or, at their option, samples of those documents"; that where FTC representatives wished to retain copies of documents they would, at the option of Hunt, "either accept photographic copies prepared by respondent or remove such documents temporarily to have them copied at the Commission's expense"; and that the total number of man hours during which FTC representatives would be present at Hunt's "place or places of business for the purpose of examining the documents involved" would be limited to 760, provided that necessary assistance was provided by Hunt in locating files containing the specified documents. With this modification, the Ninth Circuit affirmed.

One of the more commonly used methods to alleviate burden is an order requiring the agency to inspect the documents at the respondent's place of business or at the place of storage. Such a device was used in *Civil Aeronautics Board v. Hermann,* 353 U.S. 322, 77 S. Ct. 804, 1 L. Ed. 2d 852 (1957), in *Adams,* and in *Hunt Foods.*

In *F.T.C. v. Ace Books, Inc.,* 1961 Trade Cases ¶ 70,164 (S.D.N.Y. 1961), the court said, "Respondents do not contest the Commission's power but ask that the investigation be conducted at respondents' offices to obviate the need for removing voluminous records from their place of business where they are needed. This request is reasonable under the circumstances."

Another method used to alleviate undue burden is sampling where such will serve the investigative purpose. In *F.T.C. v. Texaco, Inc.,* 517 F.2d 137 (D.C. Cir. 1975), the Federal Trade Commission had charged that companies were violating Section 5 of the Federal Trade Commission Act by underreporting their gas reserves. The FTC sought to obtain all documents relative to reserve estimates which Texaco had made for its 225 gas fields for the years 1966 through 1971. The court said, "The District Court found the subpoenas to

be overly broad and unduly burdensome because they sought to duplicate activities of the Federal Power Commission which had already resulted in a finding that [American Gas Association's] proved reserve estimates were valid and accurate." *Id.* at 142. The District Court had placed a limit upon the production of these documents to a random sample of 100 out of the 225 relevant fields and to the years 1969 through 1971. The FTC argued that limiting them to a sample would foreclose the types of evaluations and comparisons they had in mind. The court observed, "It is well established that an enforcing court may limit through modification or partial enforcement subpoenas it finds to be unduly burdensome." *Id.* at 149-50. It went on to say in response to the contentions of the FTC:

> On either theory of its investigation the Trade Commission's argument is unconvincing. If the Trade Commission is looking for an antitrust conspiracy, a random sample made up of data from 45% of the relevant fields should be adequate to turn up evidence of a conspiracy (if there is evidence to be turned up). If the FTC is investigating whether either the industry-wide definition of proved reserves or the manner of reporting such reserves is an unfair trade practice, we fail to see how a random sample of data from 45% of the fields would be inadequate. A random sample permits comparisons between producers or between producers and the AGA figures, especially since the FTC already has the AGA's complete field-by-field figures. The District Court was entitled to conclude on the record before it that disclosure of data from all 220 fields would be burdensome, and that use of a random sample would neither preclude a reasonable evaluation of the manner in which reserves are estimated nor prohibit the Commission from checking the data as to its accuracy. [*Id.* at 150.]

As a part of the wide discretion which rests in them trial

judges have an obligation to police actions such as this to be certain that they are not unduly burdensome. In proper circumstances they certainly may restrict the period to be covered, may use the device of sampling or may require a partial examination and report back to the court after which it determines whether further sampling or a yet wider period should be authorized.

It is unnecessary in this case for us to determine whether the Commission's demands place an undue burden on Equitable. Our discussion of the third test enunciated in *Okla. Press* and *Banach,* "[w]hether ... the demand is not too indefinite or overbroad," is meant to impress upon trial judges some of the methods they may use to ease what may appear to be an unduly heavy burden sought to be imposed in some instances upon a defendant in matters such as this and yet promote the legitimate investigative concerns of an administrative agency such as the Commission.

> *Judgment of the Court of Special Appeals reversed and case remanded to that court for passage of an order reversing the order of the Circuit Court of Baltimore City and further remand to that court for entry of an order dismissing the petition for subpoena; appellee to pay the costs.*